## THE ALBUQUERQUE LAND AND IRRIGATION COMPANY, Appellee, v. THOMAS C. GUTIERREZ, et al., Appellants.

1. IRRIGATION—CONDEMNATION THEREFOR.—The diversion and distribution of water for irrigation and other domestic purposes in New Mexico and the western states where irrigation is necessary, is a public purpose; and it is not necessary that the company seeking to exercise the power of eminent domain itself should be the owner of the lands to be irrigated, or that it should have been employed by the owners thereof, provided that the water be applied within a reasonable time after its diversion to a beneficial use for any of the purposes stated.

2. LIMITATION UPON POWERS OF IRRIGATION COMPANIES.—The Legislature of the Territory by the provision of the Act of 1887 limited the power of irrigation companies formed thereunder to exercise the right of eminent domain: "To take and divert from any stream, lake or spring, *the surplus water*."

3. SURPLUS WATER—DEFINITION OF.—Surplus water, in the meaning of said Act, is water which has not been diverted and applied to a beneficial use prior to the attempt by the irrigation company to appropriate it to its uses. Stated concretely for this case: Surplus water is all water running in the Rio Grande not subject to a valid prior appropriation.

4.  BURDEN OF PROOF OF SURPLUS.—The burden of proving that there is a surplus of water in a given case rests upon the irrigation company seeking to make the appropriation.

5.  NO PRIVATE OWNERSHIP OF WATER IN PUBLIC STREAMS—DOCTRINE OF PRIOR APPROPRIATION.—The doctrine of the Common Law as to the private ownership of the water of public streams no longer exists in this Territory or the mountain states; the doctrine of prior appropriation has been substituted for the rule of the common law on this subject, and no longer can there be such a thing as private ownership of the water of public streams in this Territory. All the right obtainable in such water is the right to appropriate so much thereof as is actually used for some beneficial and legal purpose. The appropriation may become a vested right by continuous use, or it may be lost by non-use.

6.  PRIOR APPROPRIATION—WHAT IT IS.—To constitute prior appropriation two things must exist: 1. A rightful diversion; 2. An application to some beneficial use. Both must exist, but the application need not be to the personal use of the party diverting, provided the water be beneficially used by others.

*Appeal* from the District Court of Santa Fe County, Second Judicial District. Affirmed.

Facts will appear sufficiently from the opinion of the court.

NEIL B. FIELD for appellants.

1. When the right of plaintiff to exercise the power of eminent domain, in aid of the construction of its canal, is examined as a judicial question, it will be found not to exist.

It is undoubtedly true that the Legislature of the Territory of New Mexico has authorized the use of this power, by corporations formed for the purpose of constructing irrigating canals and has thus closed the door to inquiry by the courts as to whether or not irrigating canals constitute such public use as authorizes the taking of private property therefor, without the owner's consent, upon the payment of just compensation. When, however, this particular company comes into a court of justice, asking the aid of the court to restrain the defendants and their associates

from interfering with it in the exercise of this power and the defendants and their associates challenge the right to do the acts, the doing of which they have resisted, the existence of the right, becomes at once the subject of judicial inquiry. The use to which the plaintiff proposes to put the land, sought to be surveyed, and eventually, taken and whether such use is in fact public becomes a judicial question; no declaration of the objects and purposes of the company in its articles of incorporation can give it public character, so as to entitle it to exercise the high prerogative of sovereignty, invoked in aid of its enterprise, unless it is in fact public.

The right of the plaintiff to exercise the power of eminent domain depends upon its ability to show affirmatively that it is organized to serve the public and not merely for private gain. That such a company derives profit from its service to the public constitutes no argument against its right to exercise the power, if the ability and intent to serve the public are shown, but in this case neither the ability nor the intent has been shown. On the contrary from the facts found it is entirely clear that this is a purely speculative enterprise which seeks by taking advantage of natural conditions arising out of the topography of the country and the peculiar conditions surrounding the cultivation of the lands by means of irrigation, to compel the owners of the soil to abandon means of irrigation entirely satisfactory to them and to adopt others alleged to be more progressive.

"The right of the state to authorize the condemnation of private property for the construction of railroads and to delegate the power to take proceedings for that purpose to railroad corporations, has become an accepted doctrine of constitutional law and is not open to debate. But the power is dormant until the legislature authorizes its exercise, and the particular corporation which claims the right to exercise the power must be able to show a legislative warrant, and that being shown, it must be able, further to establish,

if the right is challenged, that the particular scheme in which it is engaged is a railroad enterprise within the true meaning of the decisions which justify the taking of private property for railroad purposes, or that the business which it is organized to carry on, is public, and that the taking of private property for the purposes of the corporation is a taking for public use. The general principle is now well settled that when the uses are in fact public, the necessity or expediency of taking private property for such uses by the exercise of the power of eminent domain, the instrumentalities to be used and the extent to which such right shall be delegated are questions appertaining to the political and legislative branches of the government, while on the other hand the question whether the uses are in fact public, so as to justify the taking in invitum of private property therefor is a judicial question to be determined by the courts. *  *  *  *  ."

"If the question, whether the purposes and objects for which the petitioner, The Niagara Falls and Whirlpool Railway Company is organized, are public, so as to justify the exercise in its behalf of the right of eminent domain, is controlled and is to be tested exclusively by the description of those objects and purposes as they are set forth in its articles of association, there could be no hesitation in concluding that the company is entitled to take the proceedings now in question, unless, as is claimed, the particular property now sought to be taken is, on special grounds, exempt from condemnation. Looking at the articles of incorporation alone it appears that the company is a railroad corporation organized under the General Railroad Act for "public use in transporting persons and property" by a railroad to be constructed between certain termini. The papers on their face show that the corporation has undertaken an ordinary railroad enterprise within the purview of the act of 1850, in aid of which the power of eminent domain may be appropriately exercised. But when we look beyond the formal documents, and the actual business

proposed to be conducted is considered, we find that the proposed railroad has no proper termini; that it is not a highway in any just or proper sense; that it cannot by reason of necessary limitations, perform one part of the duty it has undertaken, viz., the transportation of freight; that at most it can be operated but a portion of the year, and that the sole object of its construction is to enable the corporation, for a compensation to be received, to provide for the portion of the public who may visit Niagara Falls, better opportunities for seeing the natural attractions of the locality. We feel constrained to say that in our judgment this is not a public purpose which justifies the exercise of the high prerogative of sovereignty invoked in aid of this enterprise. The right of the company being challenged on this ground, the court is compelled to consider it, and it is manifest that the inquiry is not precluded because the petitioner has organized itself under the General Railroad Act and has assumed in its articles of association the character of an ordinary railroad corporation. What is a public use is incapable of exact definition. The expressions "public interest" and "public use" are not synonymous. The establishment of furnaces, mills and manufactures, the building of churches and hotels, and other similar enterprises, are more or less matters of public concern, and promote, in a general sense the public welfare. But they lie without the domain of public uses for which private ownership may be displaced by compulsory proceedings. The ground upon which private property may be taken for railroad uses, without the consent of the owner, is primarily that railroads are highways furnishing means of communication between different points, promoting traffic and commerce, facilitating exchanges, in a word they are improved ways. In every form of government the duty of providing public ways is acknowledged to be a public duty. In this State the duty of laying out and maintaining highways has in the main been performed directly by the State or by local authorities, but from an early day the legislature has from

time to time delegated to turnpike corporations the right and duty to maintain public roads in localities, and canal companies have been organized with powers of eminent domain. It would be impossible and contrary to our usages for the state to enter upon the general business of constructing and operating railroads, and, in analogy to the delegation of the power of eminent domain to turnpike and canal companies, it wisely delegates to corporate bodies the right to construct and maintain railroads as public ways for the transportation of freight and passengers and as incident thereto the right to take private property under the power of eminent domain on making compensation. In considering the question what is a public use for which private property may be taken in invitum Judge Cooley (Const. Lim. 669) remarks, "that can only be considered such, when the government is supplying its own needs or furnishing facilities for its citizens, in regard to these matters of public necessity which on account of their peculiar character, and the difficulty, perhaps impossibility, of making provision for them otherwise, it is alike proper, useful and needful, for the public to provide." Whatever rule, founded on the adjudged cases, may be formulated on this subject, it can not, we think, be framed so as to include the present case. The fact that the road of the petitioner may enable the portion of the public who visit Niagara Falls, more easily or more fully to gratify their curiosity, or that the road will be public in the sense that all who desire will be entitled to be carried upon it, is not sufficient, we think, in view of the other necessary limitations, to make the enterprise a public one so as to justify condemnation proceedings." Matter of Niagara Falls & Whirlpool Railway Co., 109 N. Y. 384.

On the twenty-ninth of January, 1889, the Union River Logging Railroad Company procured the then Secretary of the Interior, Mr. Vilas, to approve its map of definite location for a line of railway across the public domain in the then Territory of Washington, and proceeded to con-

struct a railroad, appropriating the public domain for right of way under the provisions of section 4 of the act of March 3, 1875, granting to railroads right of way across the public domain. On the twenty-ninth day of March, 1889, the incoming Secretary of the Interior, Gen. Noble, asked the opinion of the Attorney-General as to his power to annul and cancel this approval. On the fourth of May, 1890, the Attorney-General advised the Secretary of the Interior that he possessed the power to cancel the approval of his predecessor, and a rule was issued upon the Union River Logging Railroad Company requiring it to show cause before Secretary Noble why the said approval made by the former Secretary, Mr. Vilas, should not be revoked and annulled. The railroad company appeared and filed an answer, and, after full hearing, Secretary Noble annulled the action of his predecessor, and in his opinion said:

"I do not think this company is of the character contemplated by the act of March 3, 1875 (18 Stats., 482) granting to railroads the right of way through the public lands.

"While the act does not specifically define the character of the railroads which shall be entitled to the benefits of its provisions, yet it seems clear that Congress only meant to extend the benefits of the act to such railroads as are quasi public corporations and are common carriers of passengers and freight, having time cards, passenger and freight tariffs, station buildings, depots, machine shops, sidetracks, turnouts and water stations for their use and operation, and for the use of the public, and such cars as are necessary for the safe and proper transportation of freight of different kinds, and the carrying of passengers over the line of such railroad. It is a railway which is of some benefit to the public that Congress desired to favor.

"This company is not equipped with the instrumentalities evidencing such a corporation. It is purely a private enterprise, constructed solely for the transportation of supplies necessary to feed these mills, and make them and the traffic in logs and lumber a profitable venture.

"In this proceeding the respondent company was called upon to show cause why the approval of its map of definite location should not be annulled. Under said rule it was bound to show that it was in fact such a railroad as the act of Congress extends the right of way over the public lands to, and that it was rightfully entitled to the benefits conferred by said act. . It was not called on to show simply that it was organized as a railroad on paper but a railroad in fact. Its answer is indefinite and uncertain in its statements of fact; the evidence in support of its answer fails to show that said company has any depot or freight houses or has cars suitable for carrying general freight or passengers; fails to show that said road has any schedule of rates for carrying passengers or freight; fails to show that it runs its trains upon regular trips or at stated times, for the accommodation of the general public; fails to show that it starts from or terminates at any town or city. On the contrary it appears that said road has been in operation for several years through a scope of country heavily timbered and sparsely settled; that its business has been and consists almost altogether in transporting logs and lumber to tide water on Hood's canal. That it has been operated not as a public railroad, but as a private concern; not in the interest of the public, as a common carrier, but in the private interest of its owners and promoters.

"From a careful examination of the whole record I find: First—That at the time the respondent company filed its articles of incorporation with the register of the local land office, and at the time its map of definite location, or profile, was approved by the Secretary of the Interior, said company was not in fact such a railroad company as would be entitled to the benefits of the act of March 3, 1875 (18 Stats., 482).

"Second—That the approval of the map of definite location, or profile, of the respondent company's line of road made by the Secretary of the Interior, on January 29, 1889, was procured by fraud and false representations.

"From the examination given the authorities, as well as upon principles of a sound public policy, and a just and proper administration of the public land-laws, I reach the conclusion that in a case like the one at bar, the Secretary of the Interior has the power and authority to recall, annull, and set aside the action of his predecessor in office, in approving the map of definite location or profile of a railroad company, filed under the 4th section of the act of March 3, 1875. Having the power, the case at bar calls for its exercise as a bounden duty.

"It is accordingly ordered that the approval of the Secretary of the Interior, dated on the 29th day of January, 1889, of the map of definite location, or profile of the Union River Logging Railroad Company, be and the same is hereby annulled, canceled, set aside, and held for naught, and you are directed to carry out this order by causing it to be entered upon the appropriate plats and records of your office and the proper local land office." Union River Logging Railroad Company, 12 Land Decisions, 581.

The right of Secretary Noble to annul the approval, by his predecessor, of the map of definite location, to which the foregoing decision refers afterwards, came before the Supreme Court of the United States on appeal from the decree of the Supreme Court of the District of Columbia, enjoining the Secretary of the Interior from executing his order revoking the approval of the map..

The Supreme Court of the United States affirmed the decision of the Supreme Court of the District of Columbia and perpetually enjoined Gen. Noble from executing his order upon the ground that the decision of his predecessor, that the Union River Logging Railroad Company was such a corporation as was entitled to the benefits of the act of March 3, 1875, was judicial in its nature and was not subject to be annulled or set aside by a successor in office of the secretary who made the original decision.

Mr. Justice Brown, speaking for the Court in that case, said:

"At the time the documents required by the act of 1875 were laid before Mr. Vilas, then Secretary of the Interior, it became his duty to examine them, and to determine, amongst other things, whether the railroad authorized by the articles of incorporation was such a one as was contemplated by the act of Congress. Upon being satisfied of this fact, and that all the other requirements of the act had been observed, he was authorized to approve the profile of the road, and to cause such approval to be noted upon the plats in the land office for the district where such land was located. When this was done the granting section of the act became operative, and vested in the railroad company a right of way through the public lands to the extent of one hundred feet on each side of the central line of the road. Frasher v. O'Connor, 115 U. S. 10.

"The position of the defendants in this connection is, that the existence of a railroad, with the duties and liabilities of a common carrier of freight and passengers, was a jurisdictional fact, without which the secretary had no power to act, and that in this case he was imposed upon by the fradulent representations of the plaintiff, and that it was conpetent for his successor to revoke the approval thus obtained; in other words, that the proceedings were a nullity, and that his want of jurisdiction to approve the map may be set up as a defense to this suit. * * * *

"There is, however, another class of facts which are termed quasi jurisdictional, which are necessary to be alleged and proved in order to set the machinery of the law in motion, but which, when properly alleged and established to the satisfaction of the court, cannot be attacked collaterally. With respect to these facts, the finding of the court is as conclusively presumed to be correct as its findings with respect to any other matter in issue between the parties. Examples of these are the allegations and proof of the requisite diversity of citizenship or the amount in controversy in a Federal court, which, when found by such court, cannot be questioned collaterally. * * *

"In this class of cases, if the allegation be properly made, and the jurisdiction be found by the court, such finding is conclusive and binding in every collateral proceeding. And even if the court be imposed upon, by false testimony, its findings can only be impeached in a proceeding instituted directly for that purpose."   Noble v. Union River Logging R. R. Co., 147 U. S. 172.

The showing made by the plaintiff in this case falls far short of what, in the light of the authorities, is necessary to be shown to authorize the exercise of the power of eminent domain.   In re Niagara Falls & Whirlpool R'y Co., 108 N. Y. 384; Noble v. Union River Logging R. R. Co., 147, U. S. 172; Lumbering Co. v. Johnson, 46 Pac. 790; In re Deansville Cem. Assn., 66 N. Y. 569; In re Eureka Basin W. & M. Co., 96 N. Y. 42; In re Rochester H. & L. Co., 110 N. Y. 119; In re N. Y. L. & W. R'y Co., 99 N. Y. 12; In re Split Rock Cable Road, 28 N. E. Rep. 506; Apex Trans. Co. v. Garbode, 52 Pac. Rep. 573; Con. Channel Co. v. C. P. R. R. Co., 51 Cal. 269; Coster v. Tidewater Co., 18 N. J. Eq. 54; People ex rel. Robinson v. R. R. Co., 53 Cal. 694; Bridalveil v. Johnson, 46 Pac. 790.

2.   The plaintiff shows no right to divert any part of the waters of the Rio Grande, through its canal when constructed.

The learned trial judge found:

That the plaintiff's company is not the owner of any lands along the line of the proposed canal or elsewhere.

He also found:

"That there is no evidence that plaintiff has any contract with or employment by any person who is the owner of lands irrigable from said proposed canal for the conduct of water upon any such lands, or that any owner of lands not now irrigated from existing acequias, desires or intends to irrigate such lands from plaintiff's canal when completed."

The effect of these two findings taken together is, as a matter of law, that the plaintiff is without right to divert any part of the waters of the Rio Grande unless such right is granted to it by the act under which it is incorporated. So much of that act as can possibly affect the question under consideration is here set forth:

"Section 1. Any five persons who may desire to form a company for the purpose of constructing and maintaining reservoirs and canals, or ditches and pipe lines, for the purpose of supplying water for the purpose of irrigation, mining, manufacturing, domestic and other public uses, including cities and towns, and for the purpose of colonization and the improvement of lands in connection therewith; for either or both of said objects, either jointly or separately, shall make and sign articles of incorporation which shall be acknowledged before the secretary of the territory, or some person authorized by law to take the acknowledgment of conveyances of real estate, and when so acknowledged, such articles shall be filed with such secretary.

"Section 17. Corporations formed under this act for the purpose of furnishing and supplying water for any of the purposes mentioned in section one, shall have, in addition to the powers hereinbefore mentioned, rights as follows:

1. To cause such examinations and surveys for their proposed reservoirs, canals, pipe lines and ditches to be made, as may be necessary to the selection of the most eligible and advantageous routes, and for such purpose, by their officers, agents and servants, to enter upon the lands or water of any person, or of this territory.

2. To take and hold such voluntary grant of real estate and other property, as shall be made to them in furtherance of the purposes of such corporation.

3. To construct their canals, pipe lines or ditches upon or along any stream of water.

4. To take and divert from any stream, lake or spring the surplus water, for the purpose of supplying the same to

persons, to be used for the objects mentioned in section one of this act, but such corporations shall have no right to interfere with the rights of, or appropriate the property of any persons except upon the payment of the assessed value thereof, to be ascertained as in this act provided; and provided, further, that no water shall be diverted, if it will interfere with the reasonable requirements of any person or persons using or requiring the same, when so diverted.

5. To furnish water for the purposes mentioned in section one, at such rates as the by-laws may prescribe; but equal rates shall be conceded to each class of consumers.

6. To enter upon and condemn and appropriate any lands, timber, stone, gravel, or other material that may be necessary for the uses and purposes of said companies." Laws of 1887, Chapter 12.

If the power to divert any part of the waters of the Rio Grande through its canal is to be found in this act it is contained in subsection 4, of Section 17 and it may be admitted, for the purposes of argument only, that the language of subsection 4 is susceptible of the construction which seems to have been placed upon it by the learned trial judge. Its language seems, however, to lend itself much more readily to the construction contended for by defendants, when applied to the plaintiff and other corporations in like situation. If the true construction is as indicated by the judgment in this case, it amounts to a grant of the surplus waters of the Rio Grande to the plaintiff. However ingeniously the learned trial judge may have attempted to reason against this result and to convince himself that he was construing this act to constitute the plaintiff a mere carrier of surplus waters, without any beneficial ownership in the waters themselves, the only possibly consequence to follow from his construction is, that plaintiff will become the custodian of the surplus waters and that they are no longer free and subject to appropriation as Congress has said they should be, but, on the contrary, all persons who seek after

the completion of plaintiff's canal (if not, indeed, after the filing of plaintiff's articles of incorporation) to use any portion of the surplus waters of the Rio Grande, must pay tribute to the plaintiff and must accomplish their diversion through the plaintiff's canal.

It is submitted that the rights which the trial judge holds to have been conferred upon the plaintiff constitute ownership to the fullest extent to which the waters of a running stream are subject to ownership, plaintiff has acquired by legislative grant, if the trial judge is correct, the right to divert the surplus and unappropriated waters of the Rio Grande through its canal and to tax any person desiring to use any part thereof, for the privilege of so doing.

It cannot be pretended that the right thus held to have been granted by the territorial legislature belongs to the territory, but the conclusion is reached that the territorial legislature could grant away what the territory did not own and that, too, in face of the fact that Congress has expressly forbidden the legislature to attempt to do the very thing which the trial judge says it has done in this instance. In the grant of legislative power to the legislature of the Territory of New Mexico it was expressly provided that that body should not pass any law relating to the primary disposal of the soil.

Cases too numerous for citation hold that the United States is the owners of the waters of all streams, not navigable, upon the public domain.

"Would not a state law which, in advance of the grant, should attempt to take from the grantee the flow of the stream, acquired from or sought so be conveyed by the United States, and confer the waters on one who has acquired no right to them from the United States, be an interference with the 'primary disposal' of the public lands?

"We do not find it necessary to say that the prospective provisions of the code would violate the obligation of a contract. But when the state is prohibited from interfering

with the primary disposal of the public lands of the United States, there is included a prohibition of any attempt on the part of the state to preclude the United States from transferring to its grantees its full and complete title to the land granted, with all its incidents.

"The same rule must apply to homesteaders, pre-emptioners, and other purchasers under the laws of the United States. To say that hereafter the purchaser from the United States shall not take any interest in water flowing to, or in the trees on, or the mines beneath the surface, —but others of our citizens shall have privilege of removing all these things,—is to say that hereafter the United States shall not sell the water, wood, or ores. * * *

"The state has granted the waters running to its own lands, by authorizing the diversion of waters from its lands, and doubtless such grantees acquire the state property in the waters whenever the state has a property in the waters at the time of the grant. * * *

"The right to the use of the waters as part of the land once vested in its private guarantee, the state has no power to divest him of the rights, except on due compensation. Lux v. Haggin, 69 Cal. 372-3-4.

"The right of the prior occupant of the land or water on the public domain of the United States being recognized by the courts, it cannot be doubted that the legislature had power to establish or change a rule of evidence according to which the prior occupation is to be proved. With reference to appropriation of water on public lands, for example, the legislature had power to require that the notice of appropriation should contain certain statements, that work should be commenced within a definite time, and be completed within a named period, etc. Neither the state legislature nor the state courts have any independent power to interfere with the primary disposal of the public lands of the United States, nor to detract from the estates in such lands granted under the laws of the United States. Nevertheless, whilst a body of land, the waters thereon shall remain a

portion of the public lands of the United States, the right of mere possessors, or asserted possessors, will continue to be determined, as between themselves, by the law applicable to such controversies as the same was laid down by our courts previous to the code enactments, except so far as it may have been modified by the provisions of the code. The legislature of the state (with reference to occupations on the public lands), like the judicial decisions, is based on the presumption that the general government has permitted the occupation of water, or of land with the water thereon, as the case may be. Lux v. Haggin, 69 Cal. 377.

"And it cannot without extravagance be supposed, that to secure these proper and necessary ends, the Territory should assume the power to control the acquisition or transmission of property never belonging to, and not acquired from herself; to which, therefore, she could annex no conditions, much less conditions which might impair the interest of the citizens of every state, and of every state collectively in the Confederacy, and even of the United States, and render utterly worthless, and incapable of being disposed of, subjects of which the territory has no legal right or property whatever. It cannot be denied that all the lands in the Territories, not appropriated by competent authority before they were acquired, are in the first instance the exclusive property of the United States, to be disposed of to such persons, at such times, and in such modes, and by such title as the Government may deem most advantageous to the public use, or in other respects most politic. This right has been uniformly reserved by solemn compacts upon the admission of new states, and has heretofore been recognized and scrupulously respected by sovereign States within which large portions of the public lands have been comprised, and within which much of those lands is still remaining. Can this right co-exist with a power in a Territory (itself the property of the United States) to interpose and to dictate to the United States to whom, and in what mode, and by what title, the public

lands shall be conveyed?"  Irvine v. Marshall, 20 How. 561-2.

If the phrase "for the purpose of supplying the same to persons" in sub-section 4, of section 17, is limited to persons who are the owners of lands subject to be irrigated by the proposed canal and the taking is limited to a taking, in the right of and as the agent for such persons, as defendants contend it should be, the legislation of the Territory and the legislation of Congress is brought into entire harmony; otherwise and under the construction of the learned trial judge there is irreconcilable conflict.  All of the legislation of the Territory upon this subject will be found in the Compiled Laws of 1897.  Laws of 1897, Title 1, pages 1 and 2; Id. Sec. 467 to 494, both incl.; Laws of 1887, Chapt. 12, page 29; Laws of 1891, Chapt. 71, page 130; Lux v. Haggin, 69 Calif. 225; Irvine v. Marshall et al., 20 How. 558.

3.  Congress has recognized the right of prior appropriation of waters of running streams upon the public domain.  It has recognized, as a limitation of universal application upon the right, that no appropriator may divert more water that is applied to a beneficial use.

The legislation of Congress upon the subject of appropriation of waters of running streams on the public domain has been declared by the Supreme Court of the United States to be rather the recognition of existing rights than the creation of new rights.

That legislation is found in sections 2339 and 2340, Revised Statutes, as follows:

"Sec. 2339.  Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in

the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage.

"Sec. 2340. All patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the preceding section." Rev. Stats. U. S. Secs. 2339 and 2340.

In section one of the act of third of March, 1877, known as the Desert Land Act:

"That it shall be lawful for any citizen of the United States, or any person of requisite age 'who may be entitled to become a citizen, and who has filed his declaration to become such,' and upon payment of twenty-five cents per acre—to file a declaration under oath with the register and the receiver of the land district in which any desert land is situated, that he intends to reclaim a tract of desert land not exceeding one section, by conducting water upon the same, within the period of three years thereafter.

"Provided, however, that the right to the use of water by the person so conducting the same, on or to any tract of desert land of six hundred and forty acres, shall depend upon bona fide prior appropriation; and such right shall not exceed the amount of water actually appropriated and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes, subject to existing rights." 1st Supp. Rev. Stats., 137.

In section 4, of the act of 3d of March, 1891, as follows:

"Sec. 4.   That at the time of filing the declaration hereinbefore required the party shall also file a map of said land, which shall exhibit a plan showing the mode of contemplated irrigation, and which plan shall be sufficient to thoroughly irrigate and reclaim said land, and prepare it to raise ordinary agricultural crops, and shall also show the source of the water to be used for irrigation and reclamation.   Persons entering or proposing to enter separate sections, or fractional parts of sections, of desert lands, may associate together in the construction of canals and ditches for irrigation and reclaiming all of said tracts, and may file a joint map or maps, showing their plan of internal improvements."   1 Supp. Rev. Stats., page 940.

Perhaps section 18, of the same act, may shed light upon the subject:

"Sec. 18.   That the right of way through the public lands and reservations of the United States is hereby granted to any canal or ditch company formed for the purpose of irrigation and duly organized under the laws of any state or Territory, which shall have filed, or may hereafter file, with the Secretary of the Interior, a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of the ground occupied by the water of the reservoir and of the canal and its laterals, and fifty feet on each side of the marginal limits thereof; also the right to take from the public lands adjacent to the line of the canal or ditch, material, earth and stone, necessary for the construction of such canal or ditch.

"Provided, That no such right of way shall be so located as to interfere with the proper occupation by the Government of any such reservation, and all maps of location shall be subject to the approval of the Department of the Government having jurisdiction of such reservation.

"And the privilege herein granted shall not be construed to interfere with the control of water for irrigation and

other purposes under authority of the respective States or Territories." 1st Supp. Rev. Stats., page 946.

The effect of this legislation has been the subject of frequent discussion by the Supreme Court of the United States; in a recent case Mr. Justice Peckham, delivering the opinion in the case of Bear Lake Irr. Co. v. Garland, said:

"So far as the public land is concerned, over or through which these ditches for the canal were dug, the statutes above cited create no title, legal or equitable, in the individual or company that simply takes possession of such land. The government enacts that any one may go upon its public lands for the purpose of procuring water, digging ditches or canals, etc., and where rights have become vested and accrued which are recognized and acknowledged by the local customs, laws and decisions of courts, such rights are acknowledged and confirmed. Under this statute no right or title to the land, or to a right of way over or through it, or to the use of water from a well thereafter to be dug, vests, as against the government, in the party entering upon possession from the mere fact of such possession unaccompanied by the performance of any labor thereon.

"Undoubtedly rights as against third persons are acquired by priority of possession, and the government will and does recognize such rights as between those parties. This is the principle running through the cases cited by the counsel for appellants. In Sullivan v. Northern Spy Mining Co., 11 Utah, 438, which is one of those cases, the priority of possession of the person who entered upon the public land and dug the well was recognized as thereby making a superior title to the use of the water from the well over that acquired by a person who was the subsequent purchaser of the land from the government. In that case the well had been dug, and the condition fulfilled. If no well had ever been dug, and a reasonable time for digging it had passed, the mere priority of possession would have

given no superior title to the land over that acquired by the grantee from the government. It is the doing of the work, the completion of the well, or the digging of the ditch, within a reasonable time from the taking of possession, that gives the right to use the water in the well or the right of way for the ditches of the canal upon or through the public land. Until the completion of this work, or, in other words, until the performance of the condition upon which the right to forever maintain possession is based, the person taking possession has not title, legal or equitable, as against the government. What, if any, equitable claims, a party might have upon the government, who did a large amount of work, but finally failed to complete the necessary amount to secure the water or right of way, it is not necessary to determine or discuss. Those equities would not, in any event, amount to an equitable title to the right of way or to the use of the water and so need not be here considered." Bear Lake Irrigation Co. v. Garland, 164 U. S. 18-19; Jennison v. Kirk, 98 U. S. 453; Basey v. Gallegher, 87 U. S. 671; Sturr v. Beck, 133 U. S. 541; Atchison v. Peters, 20 Wall, 507; Broder v. Water Co., 101 U. S. 276; United States v. Rio Grande Dam and Irrigation Co., 174 U. S. 690.

4. The right to the use of water for purposes of irrigation is incident to the ownership cr occupation of lands, without which it does not exist.

This proposition is so firmly established, and the authorities in support of it are so overwhelming that it is not believed that counsel for plaintiff now dispute it. Certainly the trial judge recognized its existence for he said in his opinion:

"The doctrine of prior appropriation is the law governing water rights in this territory, and to constitute a valid prior appropriation of the waters of the Rio Grande two things must be established.

1. There must be a rightful diversion.

2.  An application to some beneficial use.

"And neither of these is sufficient without the other.  It is not essential that the water shall be used by the person or corporation diverting the water from the stream, for the law is well settled that water may be diverted from the stream by canals and ditches owned by individuals or corporations, and conducted long distances and beneficially used by others.  This is fully established by the large canal and ditch systems existing in California, Colorado and Arizona, and many other states.  In such cases the beneficial user is held to have constituted the ditch or canal company his agent to divert and conduct water for his use, and the Latin maxim, Qui facit per alium, facit per se, seems to apply in such cases.

"I see no reason, therefore, why such reservoir, canal and ditch companies as are authorized by the laws of the territory should not be allowed to perform services in connection with the irrigation of lands in this territory similar to those performed by such corporations in other states and territories where the same law, as to water rights, prevails.  I can see no legal reason for preventing them from exercising the powers conferred upon such companies by the statute, provided there is surplus water subject to appropriation through the agency of such company."

In most of the cases in which this question has come before the courts, the controversy has arisen between rival canal companies where all of the cultivators of the soil were interested with one or the other of the contending canal companies, but so far counsel for defendants has been able to discover, the present is the first instance in which a company formed for the construction of an irrigating canal has attempted to assert rights in a court of justice in opposition to the rights of the owners of all lands subject to be irrigated by the canal.  Counsel for defendant is therefore unable to see the application of the maxim, "Qui facit per alium, facit per se," to such a state of facts as is presented by this record.

The attempt to apply this maxim in the case at bar seem impliedly to admit all that is contended for by defendants, which is that when such corporation as the plaintiff seeks to divert waters for the purpose of irrigation, it must show that it is acting for itself and proposes to apply waters to a beneficial use upon its own lands or that it is acting for others whose agent it is and who will beneficially apply the waters so diverted to their lands.

"Does the record show a clear legal right of relator, from the enjoyment of which he is unlawfully precluded by respondent? Our constitution dedicates all unappropriated water in the natural streams of the state 'to the use of the people,' the ownership thereof being vested in the 'public.' The same instrument guarantees in the strongest terms the right of diversion and appropriation for beneficial uses. With certain qualifications, it recognizes and protects a prior right of user, acquired through priority of appropriation. We shall presently see that, after appropriation, the title to this water, save, perhaps, as to the limited quantity that may be actually flowing in the consumer's ditch or lateral, remains in the general public, while the paramount right to its use, unless forfeited, continues in the appropriator. But, to constitute a legal appropriation, the water must be applied within a reasonable time to some beneficial use; that is to say, the diversion ripens into a valid appropriation only when the water is utilized by the consumer, though the priority of such appropriation may date, proper diligence having been used, from the commencement of the canal or ditch. The constitution unquestionably contemplates and sanctions the business of transporting water, for hire, from natural streams to distant consumers. The Colorado doctrines of ownership and appropriations (as declared in the constitution, statutes and decisions) necessarily give the carrier of water an exceptional status; a status differing in some particulars from that of the ordinary common carrier. Certain peculiar rights are acquired in connection with the water diverted. It is unnecessary, now, however,

to enumerate these rights in detail; for the present, it suffices to say that they are dependent for their birth and continued existence upon the use made by the consumer." Wheeler v. Northern Colo. Irr. Co., 17 Pac. 489-90.

Defendant's contention is supported by a large number of decisions as will be seen from an examination of the following cases: Turner v. Colo., 49 Pac., 971; Combs v. Agricultural Ditch Co., 28 Pac. 966; Creek v. Bozeman Water Works Co., 38 Pac. 459; Senior v. Anderson, 115 Cal. 496; Smith v. Hawkins, 110 Cal. 122; Simpson v. Williams, 4 Pac. 1213; Pomeroy on Riparian Rights, Sec. 87; Kinney on Irrigation, Sec. 165; Barrows v. Fox, 98 Cal. 63; Faulkner v. Rondoni, 104 Cal. 140; Lux v. Haggin, 69 Cal. 255; Vernon Irr. Co. v. Los Angeles, 106 Cal. 247; Farmers Canal Co. v. Southworth, 21 Pac. 1028; Rominger v. Squires, 12 Pac. 213; Schilling v. Rominger, 4 Colo, 104; Becker v. Marble Creek Irr. Co., 49 Pac. 893; St. Louis Water Co. v. Estrada, 48 Pac. 1076; Tyler v. Wilkerson, 24 Fed. Cases, page 472, Case No. 14312; Regnew v. Tacoma Light & Water Co. 38 Pac. 147; Keeney v. Carillo, 2 New Mexico, 480.

5. The treaty rights of the defendants derived through their ancestors and predecessors in title should have been considered and determined.

The treaty commonly known as the treaty of Guadalupe Hidalgo contains the following provisions:

"In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to its guarantees equally ample as if the same belonged to citizens of the United States.

"Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States,

and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be mantained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction." Articles VIII and IX.

Some of the rights thus recognized and protected bear directly upon the questions which were before the trial court and were, presented by the allegations of the tenth paragraph of the answer. The nature and extent of those rights have been well set forth by the Supreme Court of the State of California:

"Now the waters of all rivers were, under the Spanish and Mexican rule, public property, to be administered and distributed for the use of the inhabitants. Apparently this was sometimes done by the pueblo authorities outside of the pueblo lands. It must be remembered that towns and villages were greatly favored under the Mexican system; that to establish them was the mode adopted for the settlement of the country. Contractors (capitulantes) were rewarded for organizing them. The ordinances of the king of Spain and the provisions of the government of Mexico in regard to them direct that they be located where water will be convenient. The organization of the pueblo of Los Angeles itself—to be hereafter referred to—will show the solicitude of the government in regard to this matter. Since the water belonged to the nation and could not be acquired from it by condemnation, it would seem to follow, as a matter of necessity, that, when the pueblo was organized under the laws, a sufficiency of this water for the pueblo was appropriated to it. The country was arid. The population was at first almost wholly agricultural, and, we have seen, the waters were held by the pueblo, subject to the duty of distributing the same in the public interest.

"Nor do I think this was a mere political power which

could be revoked at any time, so as to deprive the settlers, who had been induced to become inhabitants of the pueblo, of it. They had the same kind of right with reference to it which they had to the lands. Both were held as communal property, for the benefit of the inhabitants, and as an inducement to attract settlers.

"This view was adopted by this court in Lux v. Haggin, 69 Cal. 255. The question there was whether, under Mexican or Spanish law, the water of rivers was dedicated to the public in such sense that the people could not be deprived of the common use. It was said that pueblos acquired a species of property in the water of streams within their boundaries—a right which was inconsistent with such supposed dedication. They had title to such waters, subject to the public trust of continuously distributing the same in just proportion. After citing authorities in support of the position the court proceeds: 'From the foregoing it appears that the riparian proprietor could not appropriate water in such manner as would interfere with the common use or destiny which a pueblo on a stream should have given to the waters, and semble that the pueblos had a preference or prior right to some of the waters, even as against the upper riparian proprietor. The common use here spoken of, is the use for the benefit of the community or the inhabitants of the pueblo.'

"This view, I think( finds support in the history of the pueblo of Los Angeles. In 1779 it was determined to found a pueblo called Reyna de Los Angeles, settling it with soldiers and families told off from the garrisons; and the location was selected with a view to land and water for cultivation. 1781 Don Phillipe de Neve, Governor, issued a decree providing for the founding of the pueblo in the immediate vicinity of the river Porconcula; all the land capable of irrigation should be carefully examined, and a point selected for the erection of a dam, which would insure the distribution of the water to the greater portion

of the lands, and the site of the town should be as near the river as possible.

"When we remember that these pioneers were really farmers or stockraisers, and the irrigation was a necessity, this order with the instructions is very significant.

"There is also an order made by Don Pedro Fages, governor of the peninsula of California, August 14, 1786, for the distribution of lands to the settlers at Los Angeles. It commissions the Ensign Don Jose Arguello to proceed to Los Angeles and give formal possession, directing him to clearly define what are public domains, viz., water, pasture, wood, etc.

"Arguello reported his compliance September 5, 1786, showing that he had confirmed to each settler his lot, and had measured the lands still unassigned and reserved to the crown, assigning them for the common use of the settlers for pastures, for keeping stock, with a common right in all the waters, wood and timber.

"It also appears that in 1810 complaints were made to the commandante that the priests of San Fernando had diverted the water on the Cahuenga ranch, to the injury of the pueblo.  The controversy was settled, the priests acknowledged the superior right of the pueblo.

"Counsel have furnished me with translations of numerous ordinances, laws, rules and regulations of Spain and Mexico relating to this subject.  After perusing them I am satisfied with the conclusion reached in Lux v. Haggin, supra, that pueblos had a right to the water which had been appropriated to the use of the inhabitants, similar to that which it had in the pueblo lands, and that the right of its successor, the city, to the water for its inhabitants and for municipal purposes, is superior to the rights of plaintiff as a riparian owner.

"The question recurs, has the city a right to take from the river more water than it requires for those purposes that it may sell such water to those outside the city limits? I think, this question must be answered in the negative.

It was so determined in Felix v. City of Los Angeles, 58 Cal. 73, although it was also said in that case that the city had a right to all the waters of the river it required for municipal purposes or for the use of the inhabitants.

"I quote: 'It was conceded on the argument that the city had appropriated a portion of the waters of the Los Angeles river before the plaintiff constructed its ditches, and that the use by the city to the extent of such appropriation could not be interfered with by any subsequent appropriation; but it was contended that the rights of the city were limited to the amount appropriated at the time plaintiffs or their grantors built their ditch. Such a construction of the defendants' rights would not be in harmony with the facts found by the court. From the very foundation of the pueblo, in 1781, the right to all the waters of the river was claimed by the pueblo, and that right was recognized by all the owners of land on the stream, from its source, and under a recognition and acknowledgment of such right plaintiff's grantors dug their ditch. * * * * The city, under various acts of the legislature, has succeeded to all the rights of the former pueblo. * * * * From the fifth finding it appears that when the acts complained of were done by the officers and agents of the defendants, all of the waters of the Los Angeles river were required and were not sufficient to supply the wants of the city, and we are of the opinion that it was the right of the municipal authorities to prevent any diversion of said waters at the time by the plaintiffs.'

" 'We do not intend to be understood as holding, nor do we hold, that the city has the right at any time to dispose of the waters for use upon land situated without the city limits. On the contrary, we are of the opinion that the city has not that right.' Vernon Irr. Company v. Los Angeles, 106 Cal. 247.

"The plan of Pitic authorized a commissioner, after the measurement of the exterior lines of the four leagues, to set apart the ejidos, popris, etc., and to distribute the re-

maining lands to the settlers in separate tracts."

The nineteenth and twentieth sections of the plan read:

"Nineteenth—The advantage of irrigation being the principal means of fertilizing the lands, and the most conducive to the increase of the settlement, the commissioner, shall take particular care to distribute the waters so that all the land that may be irrigable might partake of them, especially at the seasons of spring and summer, when they are most necessary to the cultivated land in order to insure the crops, for which purpose, availing himself of skillful or intelligent persons, he shall divide the territory into district (partidos or hereditaments), marking out to each one a trench or ditch, starting from the main source, with the quantity of water which might be regulated as sufficient for its irrigation, at the said periods and at the other seasons of the year that they may need them, by which means each settler shall know the trench or ditch by which his hereditament shall be irrigated; and that he cannot and shall not have the power to take the water of another, nor in a greater quantity than that which may fall to his share, for which purpose and that it may not increase injury to the owners situated on the land beyond or still lower, it shall be proper for the trenches or partitions to be constructed in the main ditch made of lime and stone at the cost of the settlers themselves.

"Twentieth—In order that these (the settlers) might enjoy with equity and justice the benefit of the waters in proportion to the need of their respective crops, there shall be named annually by the ayuntamiento one alcalde (or mandador) for each trench, to whose charge shall fall the care of distributing them in the estate (heredades) comprised in the 'partido' or hereditament, which shall be irrigated by them in proportion to their need for this benefit, designating by a list which he shall make out the hours and day and night at which each owner (heredado) shall irrigate his lands sown with grain; and in order that by the

carelessness or indolence of the owners (duenos), those (the lands) that may need them shall not remain without irrigation, nor the crops be lost, whereby independent of the private injury may also result that of the public and community, produced by the want of provisions and supplies, it shall also come within the duty of the alcalde, or mandador, for each trench to have a servant (peon or day laborer), knowing the hour of the day or night designated for the irrigation of each tract of land or cornfield, who, in default of its owner, shall take care to irrigate it; the just price of his labor, whch shall be caused to be paid to him by the owner of the land or estate (heredad) irrigated to be thereafter regulated by the commissioner or by the justice." Lux v. Haggin, 69 Calif. 326.

It will thus be seen that some of the very rights upon which the defendants rely which closely affect the very subject under consideration by the court, the court did not consider but declared it would not examine in any way, defendants' treaty rights.

In order to justify this position it must be shown that Congress has passed some law affecting the subject in disregard of the treaty.

The courts have no power to enforce the provisions of a treaty with a foreign nation which the Government of the United States, as a sovereign, chooses to disregard. Botilier v. Dominguez, 130 U. S. 338.

A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other,

which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress by its declaration that "this Constitution and the laws made in pursuance thereof, and all 'treaties made, or which shall be made under authority of the United States, shall be the supreme law of the land." A treaty then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute. Head Money Cases, 112 U. S. 598.

Every treaty made by authority of the United States is superior to the constitution and laws of any individual state (or territory). If the law of a state or territory is contrary to a treaty, it is void. Hauemenstein v. Lynham, 100 U. S. 438; Strother v. Lucas, 12 Pet. 410; Fellows v. Blacksmith, 19 How. 366; DeGeofroy v. Riggs, 133 U. S. 258.

6. The allegations of paragraph ten of the answer must in this Court, be taken as true.

The plaintiff, in its reply, (characterized as its answer) to the new matter contained in the answer of the defendants does not traverse or otherwise put in issue the allegations of paragraph ten of the answer, but in the last clause of that pleading it is stated:

"And plaintiff by filing this answer does not waive the benefit of demurrer to the answer of defendants and the cross-complaint filed by them but expressly claims the same benefit thereof as if it had expressly demurred thereto."

It is true that in its answer to the cross-complaint, plaintiff upon information and belief and on the advice of its counsel, denies those allegations, as they are reasserted in the cross-complaint but so far as those allegations were relied on as a defense by the defendants they were not only not denied but by force of the statute were admitted.  Yet, the trial court held as matter of law:

"That the defendants cannot lawfully set up in this action any rights secured to them and their associates or their predecessors in title by the treaty of Guadalupe Hidalgo and that the allegations of paragraph ten of the answer of defendants with reference to the treaty rights of defendants are immaterial."

It seems only fair to the learned trial judge to say that it appears by his opinion, filed in the court below, but not a part of this record, that for some inexplicable cause the position of defendants was wholly misconceived by him.

In his opinion he said:

"Upon the allegation of defendants as to treaty rights, I am of the opinion that the lands of citizens of New Mexico, since the cession, are subject to the operation of the law of eminent domain under the laws of the United States, and the states and territories thereof, and not exempt therefrom by virtue of the treaty of Guadalupe Hidalgo.  The appropriation and distribution of water must be governed by similar laws, inasmuch as the United States has adopted its own system of water rights and adjusted the system to the different sections of the country as necessity required, and the laws of the states and territories are in harmony therewith.  Those laws must govern wherein they differ from the treaty provisions, and wherein they are harmonious, treaty provisions need not be considered.  The laws of the United States and the states and territories are ample for the protection of the rights of appropriators of water in this territory, and remedies for impairment or destruction of such rights are adequate also."

It was never for one moment contended by defendants that property which became incorporated within the territory of the United States by cession from a foreign nation was not, after such cession, subject to all the laws of the United States made in pursuance of the provisions of the constitution. On the contrary the sole contention of defendants on this branch of the case was that rights recognized and guaranteed by the treaty are not subject to be impaired by acts of the territorial Legislature.

The error of the learned trial judge is a natural one in the light of his failure to grasp defendants' contention.

It is insisted that this Court must, in considering the action of the trial Court in this regard, accept as true all of the allegations of paragraph ten of the defendants' answer, so far as the same are well pleaded. C. L. 1897, Sec. 2685, Sub-Sec. 67; Phillips on Code Pleading, Sec. 280 et seq.

7. Defendants have an absolute right to represent themselves and all others in like situation.

The trial Court held as matter of law:

"That the defendants do not and cannot in this action lawfully represent the right of such persons claiming a right to the use of the waters of the Rio Grande, by prior appropriation, when the appropriation of such persons was affected at a point below the mouth of the proposed canal of plaintiff."

In the opinion referred to it is said:

"As to the first of these allegations of the answer, I must decline to consider the rights of other than the defendants and those interested along the line of the proposed canal. The court cannot consider the rights of all the appropriators of water from the Rio Grande, below the terminus of the proposed canal: 1st, because they are not parties to the suit, and therefore not subject to the orders, nor bound by the decision of this court; 2d, the testimony of Mr. Harroun as to the flow of water shows that fully as

much water flows in the river at San Marcial, far below Albuquerque, as flows at Albuquerque and above during most of the year, and sometimes much more, all of which tends to show that there are tributaries contributing waters to the lower part of the river that must be taken into account when the appropriators below the proposed canal are determined. If the rights of the appropriators below are affected by the diversion of water through the proposed canal, the courts are open for the protection of their rights. This case involves the right of eminent domain over the defendants' land, or of land owners along the line of the canal, and as to that issue parties below the terminus of the ditch have no interest. The rights of parties to the use of water below the canal cannot be affected by this decision and will not be considered."

The restraining order, as issued, was broad enough to subject these persons to punishment as for contempt, if they disregarded it, and therefore entitled them to be heard in the court issuing it when they challenged in a lawful and legitimate way the right of the court to issue the restraining order.

The learned trial judge seems to have lost sight of the fact, shown by the Follett report referred to in his opinion, that between the mouth of the proposed canal of the plaintiff and the entry of the first tributary into the Rio Grande, to wit: the Rio Puerco, a distance of less than twenty miles, twenty-two community ditches, having a capacity of about 600 second feet of water and irrigating, as estimated by that report, 3,970 acres of land, initiate their diversion of water. By this ruling more than five thousand people (if women and children are included, and more than one thousand, if only male heads of families are counted), are denied a hearing in this case, although their rights are necessarily and directly involved in the decision.

Although these facts are not included in any finding now before this court, it is submitted that this court will not

refuse to consider them for the purpose of determining the correctness of the ruling now under consideration, and that the court will, if necessary, take judicial notice of them for this purpose.

The plaintiff sought relief against defendants and other unknown persons, and a restraining order, restraining the defendants by name and their agents, confederates and assistants from doing the things complained of, was issued. The defendants answering disclose the fact that their confederates, whom they designate as their associates, number many thousands of persons. In other words, that they were so numerous as to render it impracticable that they should all be brought before the court, and they assumed to defend for themselves and their said associates.

The learned judge, as it seems to defendants, says that as to such of the defendants' associates as effect their appropriation of the waters of the Rio Grande below the point of discharge of the plaintiffs' canal, they shall not be heard in this action and their rights will not be considered by him.

Those persons say they are not affected by this decision. That they have been restrained by an order of the court from preventing the plaintiff from the commission of trespasses upon their rights, but the court says to them: Your interests are not at stake and you shall not be heard to question the propriety of this restraining order, although any violation of it by you would have been visited with severe punishment.

Whether this canal, when completed, will diminish the flow of water in the natural channel of the Rio Grande, at any particular point, was in no just sense within the issues of the case, but the right of the canal company to exercise the power of eminent domain affected directly every prior appropriator of the waters of the rivers, at least from the head gate of the canal to the point of entrance of the first tributary, which is the Rio Puerco.

It is not denied that the court had power in this proceeding, having considered the right of the class of defend-

ants now under discussion, to determine that the temporary restraining order should be continued or dissolved as to them.

What is contended for is that the rights of these people could not be excluded from consideration in the way in which it was done.

The original restraining order which was certainly broad enough to include all such people, was by the judgment of the court made perpetual.

"In our judgment the district court committed a serious error in ordering the claim and answer of the respondent to be stricken from the files. As we are unanimous in this conclusion, our opinion will be confined to that subject. The order in effect denied the respondent a hearing. It is alleged that he was in the position of an alien enemy, and hence could have no locus standi in that forum. If assailed there, he could defend there. The liability and the right are inseparable. A different result would be a blot upon our jurisprudence and civilization. We cannot hesitate or doubt on the subject. It would be contrary to the first principles of the social compact and of the right administration of justice.

"Whether the legal status of the plaintiff in error was, or was not, that of an alien enemy, is a point not necessary to be considered; because, apart from the views we have expressed, conceding the fact to be so, the consequences assumed would by no means follow. Whatever may be the extent of the disability of an alien enemy to sue in the courts of the hostile country, it is clear that he is liable to be sued, and this carries with it the right to use all means and appliances of defense. McVeigh v. United States, 11 Wall, 267.

"Wherever one is assailed in his person or his property, there he may defend, for the liability and the right are inseparable. This is a principle of natural justice, recognized as such by the common intelligence and conscience of all nations. A sentence of a court pronounced against a party without hearing him, or giving him an opportunity to be

heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal."

That there must be notice to a party of some kind, actual or constructive, to a valid judgment affecting his rights, is admitted. Until notice is given, the court has no jurisdiction in any case to proceed to judgment, whatever its authority may be, by law of its organization, over the subject matter. But notice is only for the purpose of affording the party an opportunity of being heard upon the claim or the charges made; it is a summons to him to appear and speak, if he has anything to say, why the judgment sought should not be rendered. A denial to a party of the benefit of a notice would be in affect to deny that he is entitled to notice at all, and the sham and deceptive proceeding had better be omitted altogether. It would be like saying to a party, "Appear, and you shall be heard; and, when he has appeared, saying, Your appearance shall not be recognized and you shall not be heard." Windsor v. McVeigh, 93 U. S. 277; Hovey v. Elliott, 167 U. S. 409; Phillips on Code Pleading, Sec. 458; Bliss on Code Pleading, Secs. 79-81; Story's Equity Pleading, Sec. 120.

CHILDERS & DOBSON for appellees.

1. Upon the pleadings we submit that only three questions arise. We will take them up in the order as treated in appellant's brief.

First: When the right of the plaintiff to exercise the right of eminent domain is judicially examined, it will be found to exist.

Appellant denies this proposition, and bases his denial upon the finding of fact XV and XVI.

Finding XV: "That the plaintiff is not the owner of any land along the line of its proposed canal or elsewhere."

Finding XVI: "That there is no evidence that the plaintiff has any contract with, or employment by, any person who is the owner of lands irrigable from said pro-

posed canal, for the conduct of water upon such lands, or that the owner of any lands not now irrigated from existing acequias desires or intends to irrigate such lands from plaintiff's canal when completed." And furthermore, that the proposed use of water is not a public purpose.

We submit that there is nothing whatever in these findings to sustain the contention of the appellant that "this is a purely speculative enterprise, which seeks by taking advantage of natural conditions arising out of the topography of the country and the peculiar conditions surrounding the cultivation of the lands by means of irrigation, to compel the owners of the soil to abandon means of irrigation entirely satisfactory to them, and adopt others alleged to be more progressive." We respectfully submit that the same proposition might be urged against persons proposing the construction of a railroad through a country already served by other means of transportation, or railroads already constructed. The compulsion must come from superior facilities, or cheapened cost. It is perfectly plain that the moment this company took, or attempted to deprive any owners of existing ditches of water now appropriated and used by them, a court of equity would stop them from so doing by a writ of injunction. Appellant attempts to draw a distinction between a canal and a railroad so far as the right to exercise the right of eminent domain is concerned. We submit that he shows neither reason nor authority for such distinction. It is just as reasonable to require a railroad company to own its own freight to be transported, or to obtain its own patrons before exercising the right of eminent domain as it is a canal company. People may well say, "When you have constructed your ditch, we will talk to you. You have no ditch now ; you may never have any. We will not contract with you until you have constructed it. We know that the plaintiffs are opposing, or are about to oppose your project, and you may never be able to construct it for that reason ;— when you have done so, we will come to you." Besides, as

we will show hereafter, if no patrons are secured, the taking of water will not amount to an appropriation, and the right of way, which is a mere easement, will revert to the original owners.

The appellant proceeds to quote cases to the effect that private property can not be taken for a private purpose, under the power of eminent domain. A proposition that certainly nobody will deny. What we insist, is that it is not necessary that this company should own land of its own, or have secured contracts with prospective customers prior to its construction.

We will consider the authorities cited in appellant's brief.

The first case simply decides that a railroad intended, not for the service of the public generally, but only a small section of it, and that some of the duties required of it by the law of its creation, could not be performed by it, at all. In re Niagara Falls & Whirlpool Ry. Co., 108 N. Y. 384.

Noble v. Union River Logging Co. merely decides that the Secretary of the Interior can not revoke an act of a prior Secretary so as to disturb vested rights. 147 U. S. 172.

The opinion of Secretary Noble that a railroad constructed for the purpose of conveying the logs and lumber of a single milling company, is not constructed for a public purpose is unquestionably sound. If pertinent here, it is for the purpose of showing that the ownership of lands by the appellee, which it proposes to irrigate, would add nothing to its claim of right to exercise the power of condemnation.

In Lumbering Co. v. Johnson, 46 Pac. Rep. 790, speaking of the question of public use of a railroad, says that "it is determined by the fact that the proposed road is intended as a highway, for the use of the public in the transportation of freight and passengers, and it can make no difference that its use may be limited by circumstances, to a small part of the community. Its character is determined by the right

of the public to use it, and not by the extent to which that right is exercised. Decamp v. Railroad Co., 47 N. J. Law, 43; Phillips v. Watson, 63 Iowa, 28; 18 N. W. Rep. 659; Ross v. Davis, 97 Ind. 79. If everyone having occasion to use the road as a passenger, or for the transportation of freight may do so, and of right may require the plaintiff to serve him in that respect, it is a public way, although the number actually exercising the right is very small." Bridal Veil Lum. Co. v. Johnson, 46 Pacific Rep. 790.

In re Deansville Cem. Assn., 66 N. Y. 569, the court merely decides that, it is a judicial question, and that the taking of land to be laid out into cemetery lots and be sold to private parties, is not a proper exercise of it.

In Eureka Basin W. & M. Co., 96 N. Y. 42, merely decides that it can not be exercised to acquire real estate for the construction of wharves, which would not be open to public control or general public use.

We fail to see anything in 99 N. Y. 12. In that case, the court simply held that a railroad switch built for the ostensible, inchoate use of a brick yard, was not for public use, but private use.

In re Rochester H. & L. Co., 110 N. Y. 119, decides that property of a steamboat company, although used for the company as a common carrier, was not held by virtue of any exercise of right of eminent domain, but was acquired as private property. It was not held upon a public trust by the authority and under the ward and control of the State, and was therefore subject to condemnation.

In re Split Rock Cable Road, 28 N. E. Rep. 506, the court, referring to the Niagara Falls case, 108 N. Y. 375, holds that "under the doctrine of this and other cases, a possible limited use by a few, and then as a right, but by way of permission or favor, is not sufficient to authorize the taking of property against the will of the owner."

Apex Transportation Co. v. Garbode, 52 Pac. Rep. 573, holds that "public use" is a judicial question, and that skid road to be built solely to facilitate the business of a private

company, mainly passing and terminating at each end in the land of the company, inaccessible to the public, and not connecting at any point with a public highway, is not a road for the public use.

Con. Channel Co. v. C. P. R. R. Co., 51 Cal. 269, decides that a flume to take tailings from the mine of the owner, or to enable him to deposit tailings on his land, is not a public purpose.

People v. Robinson, 53 Cal. 694, is to the same effect— a railroad to haul the coal of one coal company, is not a railroad for a public purpose.

We have reviewed at length all the authorities cited by the appellant as to what constitutes a public purpose, except one which is not now at hand.    We respectfully submit that the appellee clearly brings itself within the rules laid down in these cases.

It does not propose to take water out of the river and carry for itself or for any particular person or persons, but to take it out, sell and deliver it to all alike, who see fit to patronize it.    Its rates are required to be uniform for all. See section 17, par. 5 of the act of 1887, under which it is incorporated and claims the right of eminent domain.    Irrigation is one of the declared purposes of the act and of its articles of incorporation.    It needs no citation of authority to show that its rates are the subject of legislative control. We cite, however, Munn v. Illinois, 94 U. S. 113; Chicago, etc., Ry. Co., v. Wellman, 143 U. S. 339; Budd v. N. Y., Id. 517; Bross v. Stoesr, 153 U. S. 391; Spring Valley Co. v. San Francisco, 82 Cal. 286; Same v. Schotsler, 110 U. S. 347.

This company can be compelled by law to furnish water to all who apply for it to the extent of its capacity.    29 Am. & Eng. Enc. of Law, 19; Hangen v. Albina Light Co., 21 Oregon 411; Price v. Riverside Co., 56 Cal. 31; Combs v. Agricultural Ditch Co., 28 Pac. 966.

The supreme court of Arizona has very fully considered the question as to whether the taking of water for purposes of irrigation as a public purpose, and fully reviews

the authorities. We can not quote at length from the opinion, and content ourselves with citing it. Oury et al. v. Goodwin, 26 Pac. 376.

The Supreme Court of the United States, we respectfully submit, has fully settled this proposition in Fallbrook Irrigation Co. v. Bradley, 164 U. S. 112. We quote therefrom as follows:

"The use must be regarded as a public use, or else it would seem to follow that no general scheme of irrigation can be formed or carried into effect. In general, the water to be used must be carried for some distance and over or through private property which cannot be taken in invitum if the use to which it is to be put be not public, and if there be no power to take property by condemnation it may be impossible to acquire it at all. The use for which private property is to be taken must be a public one, whether the taking be by the exercise of the right of eminent domain or by that of taxation. Cole v. Le Grange, 113 U. S. 1. A private company or corporation without the power to acquire the land in invitum would be of no real benefit, and at any rate the cost of the undertaking would be so greatly enhanced by the knowledge that the land must be acquired by purchase, that it would be practically impossible to build the works or obtain the water. Individual enterprise would be equally ineffectual; no one owner would find it possible to construct and maintain water works and canals any better than private corporations or companies, and unless they had the power of eminent domain they could accomplish nothing. If that power could be conferred upon them it could only be upon the ground that the property they took was to be taken for a public purpose."

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"We think it clearly appears that all who by reason of their ownership of or connection with any portion of the lands would have occasion to use the water, would in truth have the opportunity to use it upon the same terms as all others similarly situated. In this way the use, so far as this

point is concerned, is public because all persons have the right to use the water under the same circumstances. This is sufficient." Fallbrook Irrigation District v. Bradley, 164 U. S. 163.

The Supreme Court sustained a law taxing all the real property in the irrigation district, whether directly participating in the benefits of the ditches or not, in order to pay the cost of construction. We think, therefore, that the question as to whether irrigation of lands in an arid country is a public purpose is settled.

We also think it is equally clear that so far as the organization of this appellee is concerned, under the authorities above reviewed, it brings itself clearly within the criteria of what constitutes a corporation discharging a duty as a public agency.

This brings us to the consideration of the other grounds alleged in brief of appellant against the appellee's right to exercise the right of eminent domain.

2. The plaintiff has a right to appropriate any surplus waters in the Rio Grande, divert and deliver them through its canal, when constructed.

The appellant denies this and places his denial upon the ground that the court found that the plaintiff company is not the owner of any lands along the line of its ditch, and that there is no evidence that the plaintiff has any contract with, or employment by any person who is the owner of lands to furnish water. The consequences which appellants contend will follow from holding that the appellee, by complying with the statute and acquiring rights thereunder, can not follow. The very authorities cited on page 54 of appellant's brief are all to the effect that the water after it is diverted, must within a reasonable time be applied to some beneficial use. If not so applied the diversion does not amount to an appropriation, and any other person or corporation may appropriate it.

The appellant then contends that the water is the property of the United States, and that any attempt to dispose

of it is in violation of that provision of the Organic Act prohibiting any territorial legislation relating to the primary disposal of the soil. Lux v. Haggin, 69 Cal. 372, is quoted for this proposition. All that is necessary to say about this contention is that Congress, since the passage of the Organic Act, in the year 1866, enacted sections 2339 and 2340 of the Revised Statutes, recognizing the rights of prior appropriators of water, and recognizing the right to make such appropriation in accordance with "local customs, laws and the decisions of courts." The act further provides that all patents, or preemptions or homesteads shall be subject to any vested and accrued water right or rights to ditches and reservoirs in connection with such water right. Rev. Stat. of U. S., Secs. 2339 and 2340.

These sections have been construed many times by the Supreme Court of the United States. Water and ditch rights which accrued and vested after as well as those accruing and vesting before the enactment of these sections in 1866, are protected by them. Jacob v. Lorenz, 98 Cal. 332.

"This doctrine of right by prior appropriation was recognized by the legislation of Congress in 1866. The act granting the right of way to ditch and canal owners over the public lands, and for other purposes, passed on the 26th of July of that year, in its ninth section declares 'that whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same.'

"The right to water by prior appropriation, thus recognized and established as the law of miners on the mineral lands of the public domain, is limited in every case, in quantity and quality, by the uses for which the appropriation is made. A different use of the water subsequently does not affect the right; that is subject to the same limitations,

whatever the use.   The appropriation does not confer such an absolute right to the body of water diverted .that the owner can allow it, after its diversion, to run to waste and prevent others from using it for mining or other legitimate purposes; nor does it confer such a right that he can insist upon the flow of the water without deterioration in quality,, where such deterioration does not defeat nor impair the uses to which the water is applied."   Atchison v. Peterson, 20 Wallace, 513-514.

In Basey v. Gallagher, the court refers to the case last above cited, and says:

"* * * * that the doctrines of the common law declaratory of the rights of riparian proprietors were inapplicable, or applicable only to a limited extent, to the necessities of miners, and were inadequate to their protection; that the equality of right recognized by that law among all the proprietors upon the same stream would have been incompatible with any extended diversion of the water by one proprietor, and its conveyance for mining purposes to points from which it could not be restored to the stream; that the government by its silent acquiescence had assented to and encouraged the occupation of the public lands for mining; and that he who first connected his labor with property thus situated and open to general exploration, did in natural justice acquire a better right to its use and enjoyment than others who had not given such labor; that the miners on the public lands throughout the Pacific states and territories, by their customs, usages, and regulations, had recognized the inherent justice of this principle, and the principle itself was at an early period recognized by legislation and enforced by the courts in those States and Territories, and was finally approved by the legislation of Congress in 1866.   The views there expressed and the rulings made are equally applicable to the use of water on the public lands for purposes of irrigation.   No distinction is made in those states and territories by the custom of miners or settlers, or by the courts, in the rights of the first appro-

priator from the use made of the water, if the use be a beneficial one." Basey v. Gallagher, 20 Wallace, 681-682. See also Jennison v. Kirk, 98 U. S. 453; Broder v. Water Co., 101 U. S. 274.

There is nothing in the findings of fact or pleadings in this case to show that any of the land over which plaintiff proposes to conduct its ditch is public domain of the United States. If it was, the act of 1866 and the authorities quoted, show that both the water and the right of way are proper subjects of legislation.

"In other words, the United States by the section said, that whenever rights to the use of water by priority of possession had become vested; and were recognized by the local customs, laws, and decisions of the courts, the owners and possessors should be protected in them; and that the right of way for ditches and canals incident to such water rights, being recognized in the same manner, should be acknowledged and confirmed." Jennison v. Kirk, 98 U. S. 460.

The validity of such legislation by a Territory has never been questioned. It has been expressly recognized. See Sturr v. Beck, 133 U. S. 545.

Whenever the title has passed out of the United States by patent, "primary disposal of the soil has been made." Thereafter any legislation relating thereto does not "interfere with the primary disposal of the soil." This subject is fully considered in King v. Thomas, 12 Pacific Rep., 867. See also Gibson v. Chouteau, 13 Wallace, 99; Henshaw v. Bissell, 18 Wallace, 255.

Speaking of the powers of the Territorial Legislatures, some objection to the validity of this act must be found, other than interference with the primary disposal of the soil. Such objection has not been pointed out in appellant's brief, unless it be the treaty of Guadalupe Hidalgo—this we will discuss further on. "As a general thing subject to the general scheme chalked out by the Organic Act, and such special provisions as are contained therein, the local

legislature has been entrusted with the enactment of the entire system of municipal laws, subject also, however, to the right of Congress to revise, alter and revoke at its discretion. The power thus exercised by the Territorial Legislatures are nearly as extensive as those exercised by any state legislature." Hornbuckle v. Tooms, 18 Wallace, 655.

The Supreme Court of the United States has held that irrigation ditches subserve a public purpose; that the levying of taxes to pay for the same, is a legitimate exercise of the taxing power, when this is done by an organized irrigation district—it is done by a municipal or quasi-municipal corporation, as the agent of the State. The State or Territory can therefore create and grant to a corporation the power to do the same thing, whether it owns lands, or has contracts with land owners or not. Such a corporation holds its powers in trust for the State.

"It is no longer an open question in this country that the mode of exercising the right of eminent domain in the absence of any provision in the organic law, prescribing a contrary course is within the discretion of the legislature. There is no limitation upon the powers of the legislature in this respect, if the purpose be a public one, and just compensation be paid or tendered to the owner for the property taken." Lecombe v. R. Co., 23 Wallace 109.

3. We do not disagree with the appellants as to the construction given to the different acts of Congress under heading III of his brief, as it does not appear from the pleadings or finding that any of the land over which appellee proposed to conduct its ditch is public domain. If it did so appear, however, we think the authorities above cited authorized the Legislature to grant the powers granted to this corporation. Section 18 of the Act of 1891, (1 Sup. Rev. Stat., page 940), contemplates the formation of such corporations by the Territories, and grants the right of way to them over the public lands upon compliance with its terms. We think we have shown that the appropriation

of the water is to "vest, accrue, be recognized and acknowledged by the local customs, laws, and the decisions of the courts."

We also unhesitatingly admit that the appropriation of the water is not complete until it is applied to a beneficial use. We deny, however, that it can not be purchased from the carrier by the owner of the land and by him applied to that use. To hold otherwise would have prohibited and prevented the construction of all the extensive irrigation systems in the west. The water must be diverted before it can be so applied.

4. The right to the use of water for the purposes of irrigation does not depend upon the ownership or occupation of land by the person or corporation diverting the water from a stream.

If after it is diverted, application of it is made within a reasonable time to the irrigation of land, or any other beneficial use, either by the person or corporation diverting it, acting alone, or in conjunction with others, the appropriation becomes complete. We refer to what the trial judge said on this subject, quoted on pages 51 and 52 of appellant's brief and confidently assert that there is no authority to the contrary.

Appellant asserts that "the present is the first instance in which a company formed for the construction of an irrigating canal has attempted to assert rights in a court of justice in opposition to the rights of owners of all the lands subject to be irrigated by the canal. There is no finding of fact in this case upon which the statement that the five persons who are the defendants in this case are the owners of all the land to be irrigated by the proposed canal. There is no finding as to how much of the land, subject to such irrigation, they own or control. The only finding of fact on this subject is the following:

XVIII: "That some of the defendants and some of their associates are the owners of lands through which the plaintiff proposes to construct a canal."

We submit that the defendant must rest his case on this statement of fact, and that it does not bear out the statement in his brief. The counsel for appellant then quotes at length from Wheeler v. Northern Col. R. R. Co., 17 Pac. 498. We quote from that case the following, and assert that it is the law of this case, whenever the question of appropriation can be properly raised.

"But to constitute a legal appropriation, the water must be applied within a reasonable length of time to some beneficial use; that is to say, the diversion ripens into a valid appropriation only when the water is utilized by the consumer, though the priority of such appropriation may date, proper diligence having been used, from the commencement of the canal or ditch." The constitution unquestionably contemplates and sanctions the business of transporting water for hire from the natural streams to distant consumers. The Colorado doctrines of ownership and appropriations (as declared in the constitution, statutes and decisions), necessarily give the carrier of water an exceptional status; a status different in some particulars from that of the ordinary common carrier.

The case clearly and distinctly announces the doctrine that the carrier, who must necessarily be the carrier, need not be the consumer. We submit that none of the cases cited in appellant's brief are contrary to his proposition, and none of them hold that it is necessary for the diverter and carrier to obtain his consumers before he exercises the right of eminent domain, and takes out his ditch. We respectfully submit that this question of appropriation or no appropriation can not be raised, except between two rival and conflicting claimants of the water, not to prevent the construction of the ditch. The findings of fact by the court are to the effect that there is surplus water in the river subject to appropriation. Whenever appellee takes water from the river, to which appellants are entitled, the law gives them an

ample remedy by injunction. Until then their complaint is premature.

Many of the cases cited by appellant under this head seem to us to be inapplicable. The others seem to us to sustain the contention of appellee. We will briefly notice some of them.

Becker v. Marble Creek, Irr. Co., 49 Pac. 893, holds that a prior appropriator must use the water he seeks to appropriate, and must not let it run to waste. He can hold, as against a subsequent appropriator, only what is so used.

Combs v. Agricultural Ditch Co., 28 Pac. 966, holds that diversion, not followed by beneficial use does not amount to an appropriation. The amount diverted in excess of the user is not appropriated.

Creek v. Boseman Water Works Co., 38 Pac. 459, decides that a prior diverter of all the waters in a stream, which he did not use, could not deprive a subsequent diverter of the right to appropriate, by selling to a third party after the subsequent division.

Senior v. Anderson, 115 Cal. 496; 47 Pac. 454; is to the same effect, and also decides that the first diverter is not limited to the amount of water applied to a beneficial use during the first or second year's diversion, but has a reasonable length of time to so apply it. This it seems to us does not sustain appellant's contention that appellee must procure its customers in advance.

Smith v. Hawkins, 110 Cal.; 42 Pac. 453, holds that non-user for five years under California statute forfeits rights of diverter.

Simpson v. Williams, 4 Pac. 1213, decides that the diverter is only entitled to the amount used.

Barrows v. Fox, 98 Cal. 63; 32 Pac. 811, is to the same effect.

Lux v. Haggin, 49 Cal. 225; 10 Pac. Rep. 675, changed the law of California, and decided that riparian owners held some rights in the water. This decision made it necessary

to have a special session of the Legislature of the State of California.  Nevertheless, however, the decision holds that the water may be taken for a public use, just compensation being first made or paid into Court, and that water to supply farming neighborhoods is a public use.

Vernon Irrigation Co. v. Los Angeles, 106 Cal. 247; 39 Pac. Rep. 762, holds that the City of Los Angeles, as successor to the pueblo, has become the owner of all the water in the Los Angeles river, in accordance with Mexican law and by prescription.  There is no such state of facts in this case.

There are a few other citations in appellant's brief under this head, we do not deem it necessary to review.

5.  As to the treaty of Guadalupe Hidalgo.

We do not think the authorities cited by appellant sustain his contention.  The appellants do not represent any pueblo of any community.  Lux v. Haggin, 69 Cal. 63, and Vernon v. Los Angeles, 106 Cal. 247, do not sustain such a contention.  They do not deny the doctrine of prior appropriation and application to a beneficial use.  The court holds that under the ordinance, laws, etc., the pueblo was the owner of all the water in that particular river, for the use of the inhabitants of the pueblo, and that under various acts of the Legislature, and by prescription, the city had succeeded to all the rights of the former pueblo.  No such proposition is based upon the treaty, and we fail to find that there is any discussion in either case of the treaty of Guadalupe Hidalgo.  The court quotes extensively from Mexican authorities as to what was the Mexican law, and that such right in the water can be acquired by municipal corporations or bodies.  In protecting the property of municipal bodies and individuals, there can be no doubt that the treaty of Guadalupe Hidalgo guarantees the protection of the property belonging to Mexican citizens at the time the treaty was made, but we deny that it gave them any greater right, or any other protection than that which was to be

enjoyed by American citizens. Property acquired either under Mexican or Spanish title is no more sacred than that since acquired from the government of the United States. A homestead or mining claim is just as sacred as a Mexican or Spanish grant. The treaty gave Mexican citizens, and those claiming under them, no higher rights than other citizens had under the constitution and laws of the United States. This class of property is just as much the subject of public policy and legislation, as any other property, and provided such legislation does not violate the constitution.

If there is anything in appellant's contention, it would prevent the condemnation and taking of any property so acquired prior to the treaty, for a railroad, a public road, or any other kind of public use.

On the contrary, however, we understand that the doctrine of prior appropriation and beneficial use, was the law of Mexico prior to the treaty, and is now the law of that republic, just as it is the law of New Mexico. Neither do we see the applicability of what is said by appellants as to the plan of Pitic.

The defendants and appellants alleged certain rights under the treaty, but offered no proof on the subject; so far as the question before the Court was concerned, all the allegations were held immaterial. The only question was whether or not there was an unappropriated surplus of water in the river which the appellee might lawfully appropriate.

6. We think as a matter of law, upon the pleadings in this case, any attempt to set up any rights under the treaty of Guadalupe Hidalgo, was immaterial, and none such were properly pleaded.

Appellants contend that they were not denied in the answer. Of this contention, we simply say that the allegations as to ownership under the treaty, are pure conclusions of law. It is based upon the proposition plainly, that the defendants in this case have a right to represent every owner

along the entire flow of the Rio Grande, which we denied. Not only that, but the proofs taken, even if there had been an omission to deny this proposition, clearly show that the defendants did not own the entire flow of the Rio Grande, but that there was a surplus of water in the river subject to appropriation, and the court so found.

7. We respectfully submit that the appellants in this case show no right to represent any person, except themselves and those who were directly co-operating with them, as alleged in the complaint, in interfering with the prosecution of appellee's work, and that no authority which the appellant cites in his brief sustains any such proposition as he makes. In some instances suits may be brought by plaintiffs on behalf of themselves and all others similarly situated, who may come in and make themselves parties to the suit and contribute to the cost thereof. From the evidence in this case, we do not think the defendants bring themselves within any such principle. The court found as a matter of fact that they did not, and could not lawfully represent the right of such persons claiming the right to the use of the waters of the Rio Grande by appropriation at a point below the mouth of the proposed canal of the plaintiffs, and this is perfectly plain, for the appellants in this case can show no interest in any effect that the diversion of the water in the stream may have below where they, the said appellants, use the water.

No relief is asked in this case against the taking of water out of the river. The sole controversy is over the right of the appellee to go upon the lands of the defendants, survey and subsequently condemn it. The appellee is not seeking to go upon anybody's land except upon the line of its own ditch. It therefore seems perfectly plain, that for the purposes of this case, the appellees cannot attempt to represent anybody except themselves.

We also desire to call attention to the fact that the community ditches referred to in the pleadings, are made

corporations under the laws of New Mexico, and as such can sue and be sued. They are the proper parties so far as the water is concerned, and not the appellants in this case. (See Sec. 8, Compiled Laws N. M., 1897.)

Upon the subject of a few representing many plaintiffs and defendants, we cite Smith v. Swormstedt, 16 Howard 303, where it is said: "In such cases, care must be taken that persons are brought into the record who fairly represent the interests or rights involved, so that it may be fully and honestly tried." Then in Maer, etc., v. Alexandria Canal Co., 12 Peters 91, it is laid down that where the interests involved are represented by a quasi-public or municipal corporation, the suit should be brought in the name of the corporation for itself and not for anybody else.

MILLS, C. J.—The facts necessary to an understanding of this case are fully stated in the able opinion rendered by the court below, which is a part of the record in this case, and it is not necessary to re-state them here.

Two questions are to be determined in this case, first, can a company be lawfully incorporated under chapter 12 of the acts of 1887, (sections 468-493 compiled Laws of 1897), go upon the lands of private persons for the purpose of making a preliminary survey, and acquire the right of way through such lands by the exercise of the right of eminent domain under the terms of said act, unless it is shown that there is a surplus of water in the stream from which it is proposed to divert water, unappropriated and subject to diversion and appropriation? Second, can the company, organized under such act, exercise the powers granted thereby, unless it is itself the owner of the lands to be irrigated by the water to be so diverted, or have been previously employed by the owners of such land to divert water for their use?

As to the first proposition, it is sufficient to say that the court below has found, as a fact, that there is a surplus of water in the Rio Grande, subject to appropriation, and that

from said river the appellees proposed to divert, carry and distribute the same. There is ample evidence to sustain the findings of the court below, and it is a well-settled proposition that this Court can not disturb such findings.

It is undoubtedly true that the diversion and distribution of water for irrigation and other domestic purposes in New Mexico, and other Western states where irrigation is necessary, is a public purpose. This has been held by the Supreme Court of the United States in the case of Fallbrook Irrigation District v. Bradley, 164 U. S. 112. It seems to us to be equally well settled that it is not necessary that the company diverting, carrying, delivering and distributing water for such purpose shall be itself a consumer, provided that the water, when so carried and distributed, shall, within a reasonable time, be applied to a beneficial use. The able opinion of the court below discusses these propositions so fully, that we adopt its opinion and make it the opinion of this court, as follows:

This cause was brought into this court by change of venue from the county of Bernalillo, and has been submitted upon bill, answer and replication; cross-bill, answer and replication; oral and documentary evidence, and arguments of counsel.

To avoid unnecessary repetition, let it be understood that wherever the word complainant or plaintiff is used it means cross-defendant as well, and wherever the defendant is used, it means cross-plaintiff or complainant as well, as the issues joined are embodied in both the original and cross-suit and they will be considered together.

The proceedings had in these causes before his Honor Judge Crumpacker, presiding judge of the Second judicial district, have restricted somewhat the issues before this court, inasmuch as this court will not presume to review the action of the court of the Second judicial district, whose jurisdiction is co-extensive with that of this court.

The following proceedings were had in the Second ju-

dicial district court before the venue was changed to this court: Temporary injunction was granted upon complainant's bill, January 17, 1898, and the defendants were ordered to show cause why the injunction should not be continued on the twenty-fifth day of January, 1898.

Defendants filed answer, cross-complaint and affidavits, January 25, 1898, and the cause was heard by the court and taken under advisement.

On the eighth day of February, 1898, the court rendered his opinion in favor of the complainant in the bill, and entered an order continuing the injunction in force against the defendants until the further order of the court, and denying the injunction prayed for by the defendants in their cross-bill.

On the nineteenth day of February, 1898, the plaintiff in the original bill filed demurrer to the answer and cross-complaint of the defendants, but upon hearing the court overruled the demurrer by an order entered March 12, 1898. The cross-defendants filed answer to the cross-complaint, March 14, 1898, and the necessary replications being filed, the issues were fully made up on the complaint and cross-complaint.

On the eighteenth of May, affidavit and motion for change of venue was filed, and upon the same day objections were filed to the granting of the motion, but the court sustained the motion and ordered the venue changed to the First judicial district.

It will thus be seen that before the cause came into this court, his Honor, Judge Crumpacker, had not only granted the injunction prayed for in the original bill, but ordered same continued in force until further order of the court; that the injunction prayed for by the defendants in their cross-bill had been denied; and that the demurrer of the complainants to the new matter in the answer of the defendants and to their cross-complaint had been overruled. Therefore, all these matters have been eliminated and will not be reviewed here. The entire case is before this court on its merits, but the sole question to be determined is, whether or not upon

the pleadings and proofs now before the court, either of the parties are entitled to a perpetual injunction, and if so, which.   To determine this, the court must decide whether or not the Albuquerque Land and Irrigation Company have a legal right to construct canals, ditches or pipe lines authorized by their charter, and whether or not they have the right to enter upon, examine and survey, and which practically involves the right to condemn and excavate, so much of the land of private owners along the line of their proposed canals or ditches as may be necessary for such purpose.

If complainants have this right under the law, then it follows that the defendants had no legal right to interfere with or obstruct them in the pursuit of this lawful purpose.   On the other hand, if the complainant had not such a legal right, the cross-complainants had a right to prevent the company from attempting to exercise the right of eminent domain upon their lands along the proposed canal.   Many questions are suggested by the pleadings that I do not deem it necessary or proper to consider in determining this case, indeed, the proofs are not sufficiently specific to enable the court to do so. I apprehend that the sole reason why the court of the Second judicial district did not award the complainants a perpetual writ of injunction was because the court was of the opinion that the main question in the case, viz., whether or not there was surplus water in the river that the complainants would have a right to conduct through their proposed canal, for the purpose of irrigation or for some other beneficial use, should be determined upon proof and not upon bill, answer and affidavits.

That counsel on both sides so understood the issue is plain from the nature of the oral and documentary evidence taken at the hearing.   The evidence taken on behalf of the complainant tended to prove that there was surplus water in the Rio Grande at the point where the proposed canal was to be taken out, and the evidence taken on the part of the defendants, to show that all of the water of the river had been

appropriated and that there was no surplus water. Of course, there was some proof as to other matters, but this was the main controversy as shown by the evidence. Furthermore, in my opinion, the nature of the case, as well as the law applicable thereto, makes the matter of surplus water the controlling question.

In 1887 the Legislature of this Territory passed an act providing for the formation of companies for the purpose of constructing irrigation and other canals, and the improvement and colonization of lands. Section 1 of chapter 12, Laws of 1887, is as follows:

"Any five persons who may desire to form a company for the purpose of constructing and maintaining reservoirs and canals, or ditches and pipe lines, for the purpose of irrigation, mining, manufacturing, domestic and other public uses, including cities and towns, and for the purpose of colonization and improvement of lands, in connection therewith; for either or both of said objects, either jointly or separately, shall make and sign articles of incorporation, which shall be acknowledged before the secretary of the Territory, or some other person authorized by law to take the acknowledgment of conveyances of real estate, and when so acknowledged such articles shall be filed with such secretary."

That the complainant company was incorporated under this act is admitted by the defendants in their answer. Section 2 provides in paragraph 2, that:

"The purpose or purposes for which said company is formed; and if the object be to construct reservoirs and canals or ditches and pipe lines for any of the purposes herein specified; the beginning point and terminus of the main line of such canals and ditches and pipe lines; and the general course, direction and length thereof shall be stated."

The articles of incorporation of the complainant company provide:

"The purpose for which said company is formed and created a body politic and corporate is to build, construct

and maintain reservoirs and feeders therefor, canals, ditches, pipe lines, flumes and such branch lateral and side canals, pipe lines, ditches and flumes as may be necessary for the supplying of water for the purpose of irrigation and the improvement and colonization of lands in connection with such irrigation; and to acquire, purchase, lease and sell water, water rights, reservoirs, canals, ditches, pipe lines, flumes and lands in the furtherance of said purpose."

Section 3 of said article fixes the beginning point, course, direction, distance and terminus of their proposed canal, as required by law. From an examination of the law referred to and the articles of incorporation just quoted, it seems clear that the complainant company has brought itself within the terms of the law and is therefore entitled to the benefits, and to exercise all the powers conferred by the act.

The Legislature which passed the act is charged with a knowledge of the community ditch system of the Territory, and its benefits and defects. In enacting the law under consideration it was manifestly the intention of the Legislature, while preserving the present system and the rights of parties under it, to provide for a more modern and improved system of irrigation in the future, wherever it was desired and did not interfere with prior rights. That improved methods of storing and conducting water by means of reservoirs, canals, ditches and pipe lines, may be constructed and operated, the right of eminent domain is fully given by the act in the following language:

Chapter 12, section 17. "Corporations formed under this act for the purpose of furnishing and supplying water for any of the purposes mentioned in section one, shall have, in addition to the powers hereinbefore mentioned, rights as follows:

1. "To cause such examinations and surveys for their proposed reservoirs, canals, pipe lines and ditches to be made, as may be necessary to the selection of the most eligible locations and advantageous routes, and for such purpose, by their

officers, agents and servants to enter upon the lands or water of any person, or of this Territory.

2. "To take and hold such voluntary grant of real estate and other property, as shall be made to them in furtherance of the purposes of such corporation.

3. "To construct their canals, pipe lines or ditches upon or along any stream of water.

4. "To take and divert from any stream, lake or spring the surplus water, for the purpose of supplying the same to persons, to be used for the objects mentioned in section one of this act, but such corporations shall have no right to interfere with the rights of, or appropriate the property of any person except upon the payment of the assessed value thereof, to be ascertained as in this act provided: And, provided, further, that no water shall be diverted, if it will interfere with the reasonable requirements of any person or persons using or requiring the same, when so diverted.

5. "To furnish water for the purposes mentioned in section one, at such rates as the by-laws may prescribe; but equal rates shall be conceded to each class of consumers.

6. "To enter upon and condemn and appropriate any lands, timber, stone, gravel, or other material that may be necessary for the uses and purposes of said companies."

It is difficult to see how the Legislature could have conferred more complete powers upon such companies than it did by that act, and that the Legislature has power to enact a law granting the right of eminent domain is settled, provided the property taken is for a public purpose.

That lands condemned and used for the right of way of reservoirs, canals, ditches and pipe lines, for the purposes specified in the act above referred to, are for a public purpose, is too plain to require extended discussion. Congress has liberally granted this right over the public domain for the purpose of the construction of railroads and for other public uses, and State and Territorial Legislatures have granted this right

IRRIGATION: condemnation therefor.

for purposes of irrigation, railroads, public roads and for other purposes. In arid regions the construction of systems of reservoirs, canals and ditches for the use of the public in irrigating lands, is certainly as much for a public purpose as railroads or public roads, and authority to exercise the right of eminent domain is even more of a necessity than for such purposes. Broder v. Mining Co., 101 U. S. 274; Fallbrooks Irrigation District v. Bradley, 164 U. S. 112; Bridal Veil Lumber Co. v. Johnson, 46 Pac. 790; 14 Lawyers' Annotated Reports, page 762; Oury v. Goodwin, 26 Pac. 377.

The Legislature of this Territory, however, placed a specific limitation upon the exercise of the right of eminent domain, by the use of the following language: "To take and divert from any stream, lake or spring, the surplus water." Section 17, subsection 4.

LIMITATIONS upon powers of irrigation companies.

If, therefore, the complainant company proposed to divert water, and obtain a supply for its canal from the Rio Grande alone, under the above section its power to exercise the right of eminent domain would be subject to its ability to show that there was surplus water in said stream, and for that purpose, the burden of proof is upon the complainant, as the court has ruled.

BURDEN of proof of surplus.

Now, what is surplus water? Surplus water, for the purpose of this case, is water which has not been diverted and applied to a beneficial use prior to the filing of complainants' bill. To state the proposition another way: Surplus water is all water running in the Rio Grande not subject to a valid prior appropriation.

SURPLUS water: definition of.

Defendants' contention that there is no such thing as private ownership in the waters of the streams of this Territory is undoubtedly correct. All the right obtainable in the water of public streams of the Territory is the right to appropriate so much thereof as is actually used for some beneficial and legal purpose. This appropriation may

THE private ownership of water in public streams: doctrine of prior appropriation.

become a vested right by continuous use, or it may be lost by non-use, and in this the right differs from private ownership.

The doctrine of the Common Law no longer obtains in what is known as the arid and mountainous region of the west, and the doctrine of prior appropriation has been substituted for the Common Law as a matter of necessity, on account of the peculiar conditions existing in most, if not all, the mountain States and Territories.

In the case of United States v. The Rio Grande Dam & Irrigation Co. (a case decided May 22, 1899), the Supreme Court of the United States discusses the law of water rights and refers to the laws of Congress on the subject, as follows:

"Notwithstanding the unquestioned rule of the Common Law in reference to the right of a lower riparian proprietor to insist upon the continuous flow of the stream as it was, and although there has been in all the western States an adoption or recognition of the Common Law, it was early developed in their history that the mining industry in certain States, the reclamation of arid lands in others, compelled a departure from the Common Law rule, and justified an appropriation of flowing waters both for mining purposes and for the reclamation of arid lands, and there has come to be recognized in those states, by custom and by state legislation, a different rule—a rule which permits, under certain circumstances, the appropriation of the waters of a flowing stream for other than domestic purposes. So far as these rules have only a local significance, and affect only questions between citizens of the state, nothing is presented which calls for any consideration by the Federal courts." In 1866 Congress passed the following act (14 Stat. 253; Rev. Stat. 2339):

"Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same,

and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage."

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In 1887 an act was passed for the sale of desert lands, which contained in its first section this proviso (19 Stat. 377):

"Provided, however, that the right to the use of water by the persons so conducting the same on or to any tract of desert land of 640 acres shall depend upon bona fide prior appropriation; and such right shall not exceed the amount of water actually appropriated and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights."

On March 3, 1891, an act was passed repealing a prior act in respect to timber culture, the eighteenth section of which provided (26 Stat., 1101):

"That the right of way through the public lands and reservations of the United States is hereby granted to any canal or ditch company formed for the purpose of irrigation and duly organized under the laws of any State or Territory, which may have filed, or may hereafter file, with the Secretary of the Interior, a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of the ground occupied by the water of the reservoir and of the canal and its laterals, and 50 feet on each side of the marginal limits thereof; also the right to take, from

the public lands adjacent to the line of the canal or ditch, material, earth and stone necessary for the construction of such canal or ditch; provided, that no such right of way shall be so located as to interfere with the proper occupation by the government of any such reservation, and all maps of location shall be subject to the approval of the department of the government having jurisdiction of such reservation, and the privilege of water for irrigation and other purposes under the authority of the respective States and Territories."

This extended quotation from the most recent statement of the doctrine from that court will obviate the necessity of citing other cases.

Water is declared free in the public streams of the State of Colorado, by express provision of the constitution of that State, and the courts of that State apply the doctrine of prior appropriation in determining its water rights. The decisions of the courts of Colorado are, therefore, very instructive in similar litigation in this Territory, inasmuch as the Legislature of this Territory in 1876 declared that "All currents and sources of water flowing from the natural sources in the Territory of New Mexico, shall be and they are by this act declared free." Section 52, Compiled Laws of 1897.

The doctrine of prior appropriation is the law governing water rights in this Territory, and to constitute a valid prior appropriation of the water of the Rio Grande two things must be established.

PRIOR appropriation: what it is.

1. There must be a rightful diversion.
2. An application to some beneficial use.

And neither of these is sufficient without the other. It is not essential that the water shall be used by the person or corporation diverting the water from the stream, for the law is well settled that water may be diverted from the streams by canals and ditches owned by individuals or corporations, and conducted long distances

and beneficially used by others. This is fully established by the large canal and ditch systems existing in California, Colorado, Arizona and many other States. In such cases the beneficial user is held to have constituted the ditch or canal company his agent to divert and conduct water for his use, and the Latin maxim, qui facit per alium, facit per se, seems to apply in such cases.

I see no reason, therefore, why such reservoir, canal and ditch companies as are authorized by the laws of the Territory should not be allowed to perform services in connection with the irrigation of lands in this Territory similar to those performed by such corporations in other States and Territories where the same law, as to water rights, prevails. I can see no legal reason for preventing them from exercising the power conferred upon such companies by the statute, provided there is surplus water subject to appropriation through the agency of such company.

To determine whether or not there was any surplus water in the Rio Grande, subject to appropriation and use by complainant's proposed canal or ditch, it becomes necessary to ascertain from the evidence how much of the waters of that stream had been legally diverted and used for a beneficial purpose prior to the inception of plaintiff's rights.

I find, from the evidence, that the headgate of complainant's proposed canal is to be at a point on the Rio Grande three-eighths (⅜) of a mile below or south of the Indian village of San Felipe, about 28 miles above the City of Albuquerque; that the terminus or point of discharge into the river is at the railroad bridge near Isleta, the entire length of the canal to be about 35 miles; the present proposed terminus is at the City of Albuquerque; that the engineer of the company, Mr. Harroun, was proceeding with a survey of the line between Albuquerque and the headgate when the interference of the defendants occurred, which led to the legal proceedings in which injunction issued as above referred to. The capacity of the canal I find to be 210 cubic feet of water per second.

There is controversy as to the number of ditches on either side of the river between the proposed headgate of the proposed canal and Albuquerque, and also from Albuquerque to the terminus. All of the witnesses agree that there are at least ten acequias taking water from the river between the proposed headgate and Albuquerque on the east side, and at least three upon the west side. There are seven ditches heading below Albuquerque, down to Isleta, as shown by Mr. Follett's report, and all upon the west side of the river.

The capacity of these ditches must be ascertained from the testimony of Mr. Harroun, and Mr. Follett's report, as none of the other witnesses testify upon this point.

Mr. Harroun, and Mr. Follett's report practically agree that the 10 ditches on the east side of the river above Albuquerque have a capacity of 180 cubic feet per second, and that the three ditches on the west side above the city have a capacity of 45 cubic feet per second. Mr. Follett's report alone gives the capacity of the ditches between the city and Isleta, and from this we find their capacity to be 273 cubic feet per second. Thus I find that the capacity of all the old ditches along the route of the proposed canal to have been 498 cubic feet per second, and this amount of the water of the Rio Grande was legally diverted by the old ditches prior to the existence of any rights of the complainant.

The proof as to whether or not this entire amount was used for a beneficial purpose is not sufficiently specific to enable the court to find that it was not. Mr. Harroun is of the opinion that about one-half of the water diverted by the old ditches is wasted, and while the court has no doubt that a large portion of the water thus diverted is wasted, still the proof is too general to warrant the court in holding that any specific part is wasted and not applied to a beneficial use. For the purposes of this case, therefore, I feel compelled to hold that there has been a prior appropriation of the water of the Rio Grande to the extent of the capacity of the ditches above referred to, but the court realizes that

this is a very uncertain conclusion, as the testimony of Mr. Harroun is, that there are about 1,800 acres of swamp and meadow lands made thus by the waste waters from the old ditches. However, as this is not a final determination of this question, except for the purposes of this inquiry, it is the duty of the court to over-estimate rather than under-estimate the quantity of water appropriated, that prior rights may be fully protected, in view of the uncertainty of the evidence on this point.

Turning now to the flow of water in the river at the point where the headgate of the proposed canal is to be located, I find the most reliable evidence to be that of Mr. Harroun, and the data submitted in connection with his testimony, inasmuch as his personal researches and investigations have been much greater than those of the other witnesses, and being a competent civil engineer, his means of knowledge are much better than those of other witnesses. Indeed, he is the only witness on either side who attempts to testify as to the amount of water flowing in the Rio Grande, in any specific manner. The other witnesses testify that the river was dry at certain times, and give their opinion as to whether or not there was any surplus during the dry season, but none of them attempt to testify as to the amount of water flowing in the stream. Mr. Follett's report as to this matter is based largely upon data furnished by Mr. Harroun, as the report states, and as to certain dates and places, agrees with the testimony and data of Mr. Harroun, but Mr. Harroun testifies much more fully and submits data made upon more extensive and reliable investigation than that upon which the Follett report is based, and is, therefore, more satisfactory. These measurements are only approximately correct, it is true, but they are the best obtainable evidence and are superior to the evidence not based upon measurements.

In regard to the flow of water in the Rio Grande at Embudo, Rio Grande and San Marcial for the years 1895, 1896 and 1897, Mr. Harroun testifies:

"In 1895 the flow at Embudo aggregated 885,279 acre feet. That flow may be taken as the flow of San Marcial. The flow at Rio Grande during the same year was 1,392,507; there was an increase between these two points of 57 per cent.

"Q.  Between Embudo and San Marcial?  A.  Yes, sir; 57 per cent. in 1895, between these two points.  In 1896, the flow at Embudo was 467,960 acre feet.

"Q.  What was it at San Marcial?  A.  There is no record made for 1896; no. record whatever; although the gauge heights are kept continually the channel is so shifting that with the few measurements that were made during that year no careful conclusions can be drawn from the gauge heights; but in 1896, the flow at Embudo was 467,960 acre feet with an increase of 47 per cent. between that and Rio Grande, which was 698,072 acre feet; the flow at San Marcial during 1896 was 566,499, or a loss between these two points of only 19 per cent.; in 1897, the Embudo flow was 1,112,382 acre feet, and Rio Grande 1,909,060 acre feet, showing an increase between these two points of 71 per cent.; the flow at San Marcial was 2,331,586 acre feet, an increase of 22 per cent. between these two points.

"Q.  Explain what you mean by acre feet?  A.  An acre foot is the amount covering one acre one foot, 43,560 cubic feet equal to about one acre foot in every 24 hours.

"Q.  I will ask you to state if you have the data from which you can give the flow at these points in the months beginning with February and ending with October in each year of these years?  A.  Yes, sir; at Embudo the mean flow in 1895, during the month of February, was 503 cubic feet a second; in March, 759; April, 2,541; May, 2,679; June, 3,021; July, 1,335; August, 1,080; September, 636; and October, 494.

"Q.  In 1895?  A.  Yes, sir.  At Rio Grande, the same year, the flow in February was 591, this is the mean flow for the month; March, 1,371; April, 5,075; May, 4,411; June, 4,520; July, 1,768; August, 1,.81; September, 722; October,

707; there is no record of San Marcial during 1895. In 1896, at Embudo, the mean February flow was 551; March, 957; April, 1,797; May, 1,598; June, 367; July, 299; August, 249; September, 222; October, 349; for 1896, at Rio Grande, there is no record from March 4th to March 31st; the first three days of March giving a mean flow of 1,355 second feet; for April, 3,483; May, 2,704; June, 535; July, 412; August, 243; September, 299, and October, 461; for 1896, at San Marcial the mean flow for February was 680; March, 679; April, 3,142; May, 2,019; June, 466; August, 1,181; September, 130; October, 742. In 1897, at Embudo, the flow in cubic feet per second was, for February, 407; March, 561; April, 1,691; May, 5,443; June, 4,596; July, 1,248; August, 388; September, 344, and October, 1,535; at Rio Grande for the same year, the flow was for February, 541; March, 985; April, 5,056; May, 11,454; June, 6,153; July, 1,580; August, 458; September, 650; October 2,227; for San Marcial during the same months, the flow for February was 434; March, 660; April, 3,584; May, 12,173; June, 6,156; July, 1,117; August, 101; September, 1,907; October, 4,019; as I have said before the record for 1898 is not concluded; that is the mean flow for the months mentioned.

"Q. Now explain what you mean by mean flow? A. The mean flow as there noted, is the sum of the acre feet per day divided by the number of days in the month, the sum of the acre feet and the number of feet per second divided by the number of days in the month.

"Q. I want to get the flow in each month, for a given day in each month, for the months of May, June, July and August, of each of the years from which points your observations were taken nearest to this ditch. A. The nearest station is at Rio Grande; the flow for April was 1,610 cubic feet per second; these are all figures in cubic feet per second; in May, 2,240; June, 1,120; July, 1,005; August, 705; September, 530. In 1896, the mean flow for April was 1,265; May, 255; June, 255; July, 210; August, 255; September, 350. For 1897, the mean flow for April was 10,200; May, 8,800; June, 2,486; July, 200; August, 240; and September, 360.

"Q. How far is this Rio Grande station from the proposed headgate of this plaintiff's canal? A. It is about thirty-five miles."

Mr. Follett's report shows the following flow at Rio Grande station for the years 1895 and 1896: Summer flow in second feet in 1895—April, 5,070; May, 4,615; June, 4,630; July, 1,170; August, 1,480; September, 720. In 1896—April, 3,480; May, 2,710; June, 580; July, 440; August, 195; September, 590. Winter flow for same years at same station: October, 705; November, 835; December, 710; January, 760; February, 790; March, 1,370.

Rio Grande station is selected for illustration because it is the nearest station, where measurements were taken yearly, to the headgate of the proposed canal, thirty-five (35) miles, and Mr. Harroun further testifies that the flow at the headgate was substantially the same as at Rio Grande station for the reason that there are tributaries between those points supplying a sufficient amount of water to equal the loss from seepage and evaporation.

From this testimony, I find, as a fact, that while during a few months, or parts of the summer months, of the years 1894, 1895, 1896 and 1897, there was no surplus water flowing in the river at the proposed headgate, during a large majority of the months of each of these years there was a large amount of surplus water flowing past that point. All of the witnesses testify that the years 1894, 1895 and 1896 were the dryest years known, some say for ten and others for twenty years, and the only years in which the river was dry at or above Albuquerque.

I also find, as a fact, that in a majority of the last ten years there has been surplus water flowing in the river at the proposed headgate at all times, as witnesses, some of whom were mayordomos of those ditches, testify there was no scarcity during those years.

I further find, as a fact, that the river became dry at Albuquerque about the last of June and remained so, as most of the witnesses testify, for twenty-two days in 1894,

and also in July, 1896, the number of days cannot be definitely stated from the evidence. Mr. Follett's report states that the river was dry at Albuquerque through July, 1895, but Mr. Follett doubts this, and it would seem clear that it was not, as Mr. Follett's report states that there was "water all summer" in the river at Los Lunas. I find as a fact that the irrigation season begins in February and ends in October.

I find, as a fact, that the months of June, July, August and September, are considered the dry season, and I further find that what is known as the rainy season occurs during these months, also, so that it is possible for the dry season to become the wet season and the anomaly may be explained by stating that the term "dry season" refers to the water in the river rather than the rainfall.

I find, as a fact, that very few farmers, served by the present ditches, sow wheat, oats, barley or rye in the fall of the year, but do so in the spring, beginning during February or March; and I further find that very little, if any, of the water now appropriated is used for those crops after July 1st, in fact, very little is used for those crops after June 15th, but water is used for chile, corn, alfalfa and melons after that time, and for alfalfa as late as October. It appears, therefore, that less of the water diverted by the present ditches is used after the first of July, than is used before that date when the grain crops and all others are growing.

The witnesses for the defense were asked the following question: "From your knowledge of the existing system of community ditches and of the Rio Grande, is there, or is there not, any surplus of water in the Rio Grande in that vicinity during the dry season?" The answer was that there was no surplus.

As has been stated, there was also testimony that the river was dry in 1894 and 1896 at different dates during the dry season. It will be observed that this testimony is confined, especially, to the dry season. This period in-

cludes June, July, August and September, but as a matter of fact there is usually a large surplus in June, and frequently in September, also.

The limitation to the dry season makes the testimony immaterial, because if there was surplus water flowing in the river there at any time it was subject to diversion and use, and being surplus and unappropriated water, there can be no injury done to any prior appropriator; the law will protect him in the use of the water actually appropriated. Section 17 of chapter 12 grants the right of eminent domain to companies utilizing surplus waters for certain beneficial purposes, and the use of the word surplus would indicate that the Legislature had in mind streams whose waters had been in part appropriated. If there is surplus and unappropriated water in the stream, companies have a right to organize and exercise the powers conferred upon them by the statute and this right is not dependent upon a contingency such as the possible failure of the water supply during a few months of exceptional years.

The court takes judicial notice of the fact that from October until about the first of March in each year there is very little water used for any purpose by the farmers in the valley of the Rio Grande, and as a matter of law, it is not an invasion of his rights for a subsequent appropriator to use water after a prior appropriator has ceased to do so.

I am unable to ascertain the acreage in cultivation, except from the testimony of Mr. Harroun, as the other witnesses do not know and do not attempt to state it. Mr. Harroun says there are probably 12,000 acres there, subject to irrigation, but that only about 3,200 acres are served by the present ditches, and this is the extent of present cultivation; and he further says that at least 7,000 additional acres could be served by the proposed canal if a supply of water equal to the capacity of the canal can be obtained.

The witnesses on behalf of the defendants testified that they did not know of any beneficial use to which complainants could put the water in the event of the construction

of the proposed canal. Such evidence is not of much value
in view of the testimony that there are 7,000 acres of irri-
gable land which the present ditches are unable to serve.
If any part of this additional acreage could be brought un-
der cultivation by means of the canal it would be a beneficial
purpose within the meaning of the statute. It is evident
that these witnesses so testified from a belief that there is
no surplus water, or, that the present method of irrigating
and cultivating land cannot be improved. I am of the opin-
ion that the premises are wrong in either case and their con-
clusions necessarily wrong.

The court has found that there is surplus water in the
Rio Grande during a majority of months of every year, and
is equally satisfied that the present system of both irrigating
and cultivating lands in this Territory can be greatly im-
proved by the adoption of more modern methods of storing
and conducting water upon the lands, and a more economi-
cal use of it when so conducted. Mr. Follett's report
shows that many of the present ditches were in use 100
years ago, and it would seem strange that a system one hun-
dred years old could not be improved upon.

I do not underestimate the present ditch system,
for in some respects it is very good and so long as it is in
existence its status and rights must be upheld by the courts;
but that it is not an economical system, that it has no pro-
vision for storing water, and that there is an equal distribu-
tion of the water, is within the knowledge of this court,
and is shown by the testimony.

The suggestion that the water cannot be used for a
beneficial purpose during the six months when it is not used
by the ordinary farmer I cannot accept. Mr. Blueher testi-
fies that he uses water all the year in his market gardening,
and in view of the provision of the statute, and of complain-
ant's charter, the court would not be warranted in holding
that the water cannot be applied to some of the purposes
declared to be a beneficial use by the statute.

The right of eminent domain may be exercised by cor-

porations organized under chapter 12, Laws of 1887, in con-
structing reservoirs, canals, ditches and pipe lines for the
purpose of conveying surplus water for irrigation, manu-
facturing or mining purposes, and the exercise of this right
is not dependent upon the ownership of lands by the com-
pany or contracts with customers for the use of water.
These considerations may be important when the actual
diversion of the water through the canal is attempted, but
for the purpose of constructing the system the existence of
surplus water is the controlling consideration.   These com-
panies are quasi-public servants, and their existence is au-
thorized by law.

In Wheeler vs. Irrigation Co., 17 Pac. 487, the Supreme
Court of Colorado says that such a canal is a "quasi-public
servant.   It exists largely for the benefit of others, being
engaged in the business of transporting for hire water
owned by the public to the people owning the right to its
use.   It is permitted to acquire certain rights' as against
those subsequently diverting water from the same stream.
It may exercise the right of eminent domain."

In Coombs vs. Ditch Company, another Colorado case,
it was held that an owner of land along the line of the ditch
could compel the company to supply him with water; 28
Pac. 966.

In Broder vs. Mining Company, 101 U. S. 274, it was
held that the rights of such companies "are rights which
the government had recognized and encouraged and was
bound to protect."

In Ditch Company vs. Bennett, the court says:

"No sufficient reason has been suggested why the con-
templated use may not be for and upon the possession of a
person other than the appropriator.   The authorities we
have seem to support that it can be, and we believe it is
correct upon principle.   We take it, therefore, that the bona
fide intention, which is required of the appropriator to apply
the water to some useful purpose, may comprehend a use
to be made through some other person and upon lands and

possession other than those of the appropriator. Thus the appropriator is enabled to complete and finally establish his appropriation through the agency of the user."

It is also held that such canal companies "must be regarded as an intermediate agency existing for the purpose of aiding consumers in the exercise of their constitutional rights, as well as a private enterprise prosecuted for the benefit of its owners." Wyatt v. Irrigation Co., 33 Pac. 147; Reservoir Co.·v. Southworth, supra; Strickler v. Colorado Springs, 26 Pac. 313; Oury v. Goodwin, 26 Pac. 377.

The law laid down in the cases cited above is applicable to similar litigation in this Territory, as the law of prior appropriation governs in both jurisdictions. These corporations are deemed to be beneficial in the development of the country and the right of eminent domain is accorded them to facilitate their operations. Sub-section 6 of section 17, quoted above, provides that lands, stone, timber, gravel or other material, or so much thereof as may be necessary, may be condemned and appropriated by such companies, but in case of a failure to agree upon compensation for property thus taken, section 18 provides:

"Should any such corporation be unable to agree with the owners as to the compensation to be paid for any such land, water, timber, stone, gravel or other materials, the amount shall be ascertained and determined by the appraisal of three disinterested commissioners, who shall be appointed on application of either party, and upon five days' notice to the other party, by the judge of the district court in and for the district in which such land, water, timber, stone, gravel or other material may be situated; and said commissioners, in their assessment of compensation, shall appraise such premises or property at what would have been the value thereof, if such reservoirs, canals, ditches or pipe lines for which such premises or property shall be required, had not, or was not in contemplation of being built or constructed; and upon a return into court of such appraisement, and upon the payment of the clerk thereof,

or to the parties entitled to such compensation, the amount so assessed by such commissioners, the land, water, timber, stone, gravel or other materials so appropriated shall be deemed to be taken by such corporation, which shall thereby acquire full title to the same, for the uses and purposes aforesaid."

In view of these provisions of the statutes, it cannot be considered an invasion of private rights, to condemn and appropriate so much of the lands of private owners as may be necessary, by such reservoir and canal companies. Compensation for such property is deemed sufficient for the owner, but the right to the use of so much water as has been lawfully appropriated is not subject to this rule, and the appropriator is given ample protection by the provision that only surplus water may be appropriated by such companies.

Defendants contend that under section 25 of the act above referred to, the complainant company is prohibited from appropriating any water from the Rio Grande between the fifteenth day of February and the fifteenth day of October in each year. While I do not deem it necessary to pass upon this question for the purpose of this case, I have given the matter consideration and have arrived at the conclusion that the Rio Grande is not within the operation of that section.

The act of 1887, section 25, being section 492 of the Compiled Laws of 1897, provides in substance that no corporation organized for taking water for the purpose of irrigation or other purposes shall have any right to divert the use of the natural flow of water or any stream which by the law of 1854 had been declared a public acequia, for any use whatever, between the fifteenth day of February and the fifteenth day of October of each year, unless with unanimous consent of every person holding agricultural and cultivated lands under such stream or public acequia, etc.

A reference to the session acts of 1854 will show that there was no statute passed at that session of the Legislature on the subject referred to. In 1852 the act of January

7 was passed, which may be found in the Compiled Laws of 1865, page 20, in full; all the material sections of this act were also compiled in 1884, beginning with section 6 of the Compiled Laws of 1884, in fact section 6 is the only material section so far as the present inquiry is concerned. This section is also carried into the compilation of 1897, as section 6. As there was no act of 1854, as referred to in the act of 1897, it is clear that this was a mistake; the act of 1852 was evidently intended. In 1854 the Davenport compilation of the statutes was made and the act of 1852 was carried into that compilation in full. See Revised Code of New Mexico, page 86. This accounts for the mistake; reference was evidently had to that code instead of the Session Act.

A consideration of the section (6) above referred to, together with the entire act, will show that it could have no application whatever to a stream like the Rio Grande; what is meant by this section is such ditches, acequias or natural water courses used as acequias, as have become the subject of private or community ownership, and upon which labor is expended for the purpose of appropriating the water therefrom and using the same to irrigate the lands of the persons so working thereon.

The defendants seek to defend, not only on behalf of themselves, but also on behalf of their grantors, ancestors and others "to the number of many thousands," and allege that for centuries, in some instances, their grantors and ancestors had used the waters of the Rio Grande and had secured rights under the laws of Spain and Mexico, guaranteed to them by the treaty of Guadalupe Hidalgo, to the full extent of the flow of said river during the planting and growing seasons, etc.

As to the first of these allegations of the answer, I must decline to consider the rights of other than the defendants and those interested along the line of the proposed canal. The court cannot consider the rights of all appropriators of water from the Rio Grande below the terminus

of the proposed canal.   First, because they are not parties to the suit, and therefore not subject to the orders, nor bound by the decision of this court.   Second, the testimony of Mr. Harroun as to the flow of water shows that fully as much water flows in the river at San Marcial far below Albuquerque, as flows at Albuquerque and above during most of the year, and sometimes much more, all of which tends to show that there are tributaries contributing waters to the lower part of the river that must be taken into account when the rights of appropriators below the proposed canal are determined.   If the rights of appropriators below are affected by the diversion of water through the proposed canal, the courts are open for the protection of their rights. This case involves the right of eminent domain over the defendants' land, or of land owners along the line of the canal, and as to that issue parties below the terminus of the ditch have no interest.   The rights of parties to the use of water below the canal cannot be affected by this decision and will not be considered.

Upon the other allegation of defendants as to treaty rights, I am of the opinion that the lands of citizens of New Mexico, since the cession, are subject to the operation of the law of eminent domain under the laws of the United States, and the States and Territories thereof, and not exempt therefrom by virtue of the treaty of Guadalupe Hidalgo.   The appropriation and distribution of water must be governed by similar laws, inasmuch as the United States has adopted its own system of water rights and adjusted the system to the different sections of the country as necessity required, and the laws of the States and Territories are in harmony therewith.   These laws must govern wherein they differ from the treaty provisions, and wherein they are harmonious, treaty provisions need not be considered.   The laws of the United States and the States and Territories are ample for the protection of the rights of appropriators of water in this Territory, and remedies for impairment or destruction of such rights, are adequate also.

It is insisted that the complainant company does not intend to construct a reservoir, or reservoirs, for the purpose of storing surplus water, nor has it the means to do so. The statute certainly authorizes such companies to do so; the charter of this company provides for such construction; Mr. Childers, one of the incorporators, testifies that it is the intention of the company to construct reservoirs if it becomes necessary to do so; and Mr. Harroun's testimony is to the same effect, and further, that it is feasible to do so. In view of this evidence, and the fact that other evidence in the case shows that the complainants are aware that the river may not contain surplus water at all times, I cannot accept the view that complainants do not intend to construct reservoirs for the storage of water; that they have not the means to do so is not a material matter at this time.

The fact that the headgate of the proposed canal is situated above the mouths of the other ditches is not material, as the rights of prior appropriators will be the same in any event.

It is true that the proposed canal may cross the line of one or more of the old ditches, but the construction of the canal cannot be prohibited for this reason. It is within the knowledge of this Court that the ditches now existing cross each other without affecting the flow of the water. Some of the ditches in the vicinity of Albuquerque cross each other, as shown by the plat filed as evidence. Of course, the complainant company will not be allowed to destroy the present ditches or in any way diminish the flow of water lawfully diverted by or flowing through the old ditches. If, however, the canal can be constructed without injury to the present capacity of the old ditches, it may lawfully be done. The remedy that the law provides cannot be invoked until injury is attempted or threatened, but the construction of the canal alone is not necessarily an injury, as it may not affect the rights of prior appropriators in the slightest degree.

The full scope of the defense in this case is to the effect, that all of the water of the Rio Grande had been legally ap-

propriated before the inception of complainant's rights. The logical conclusion from this would be, that there can be no further diversion of water from this stream, no further ditches or canals constructed, and no further lands brought under cultivation. I cannot so conclude from the evidence in this case, nor from the law of the case, as I understand it.

I am of the opinion that the complainant company had a legal right to construct the proposed canal at the time it attempted to do so, and for that purpose it was authorized to enter upon, examine and survey so much of the lands of the defendants as were necessary for the construction of said canal. That the defendants had no right to obstruct or interfere with the agents of the complainant in the prosecution of its work. That the injunction was properly granted and continued in force, and that the same ought to be made perpetual by the order of this court.

It is, therefore, ordered that the decree rendered by the court below, be affirmed, and that a decree be entered accordingly and that appellee have and recover its costs expended in this behalf, to be taxed.

Parker and Leland, JJ., concur.

McFie, J., before whom the case was tried below, did not sit.